Appeal Nos. 2015-2063, -2064

IN THE

# United States Court of Appeals
### FOR THE FEDERAL CIRCUIT

MERCK & CIE, BAYER PHARMA AG and BAYER
HEALTHCARE PHARMACEUTICALS INC.,

*Plaintiffs-Appellees,*

v.

WATSON LABORATORIES, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
District of Delaware in Case Nos. 13-978-RGA, 13-1272-RGA,
Judge Richard G. Andrews

## BRIEF OF DEFENDANT-APPELLANT
## WATSON LABORATORIES, INC.

STEVEN A. MADDOX
 *Counsel of Record*
JEREMY J. EDWARDS
MATTHEW C. RUEDY
KAVEH SABA
**MADDOX EDWARDS, PLLC**
1900 K St. NW, Suite 725
Washington, DC  20006
(202) 830-0707

October 20, 2015                    *Attorneys for Defendant-Appellant*

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Watson Laboratories, Inc. certifies the following:

1.     The full name of every party being represented by me is:

Watson Laboratories, Inc.

2.     The real party in interest represented by me is:

Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are as follows:

Watson Laboratories, Inc. is a wholly-owned subsidiary of Actavis, Inc.

Allergan plc is a publicly held company that owns more than 10% of Actavis, Inc.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

Law Firm of Maddox Edwards, PLLC:  Steven A. Maddox, Jeremy J. Edwards, Matthew C. Ruedy, and Kaveh Saba;

Law Firm of Knobbe, Martens, Olson & Bear LLP:  Steven A. Maddox, Jeremy J. Edwards, Jonathan E. Bachand, Andrea L. Cheek, and Christie R.W. Matthaei; and

Law Firm of Potter Anderson & Corroon LLP:  Richard L. Horwitz, David E. Moore, Bindu A. Palapura, Stephanie E. O'Byrne, and Eric W. Struble.

Respectfully submitted,

**MADDOX EDWARDS, PLLC**

By: _/s/ Steven A. Maddox_
STEVEN A. MADDOX
   _Counsel of Record_

_Attorney for Defendant-Appellant_
Watson Laboratories, Inc.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ............................................................... ii

TABLE OF CONTENTS ...................................................................... iv

TABLE OF AUTHORITIES ............................................................... vii

STATEMENT OF RELATED CASES ................................................ xiv

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES ..........................................................2

STATEMENT OF THE CASE ..............................................................3

   A.     The Asserted Claim of the Patent-in-Suit ...................................3

   B.     Facts ............................................................................................4

      1.   Overview ...........................................................................4

      2.   Merck's and Weider's Failed Negotiations for an Exclusive Partnership in Research, Development, and Marketing of Merck's New MTHF in Weider Products .............................................................................6

      3.   Merck Faxes Weider a Signed Offer to Sell 2kg of MTHF, in Response to Weider's Inquiry about a Simple Stand-Alone Purchase. ..................................8

      4.   Weider Accepts the Offer in the Manner Prescribed by Merck, and Merck Confirms the Offer and Sale. ............................................................9

      5.   Merck Delays Delivery to Pursue a More Lucrative Deal with Weider's Competitor, and Weider Raises the Delay with Merck. ...................................12

   C.     The District Court's Decision ...................................................14

      1.   The District Court's Findings of Facts .......................................14

      2.   The District Court's Conclusions of Law ................................15

   SUMMARY OF THE ARGUMENT ...................................................17

ARGUMENT ...................................................................................................20

A.     Standard of Review ..................................................................................20

B.     The Asserted Claim is Invalid under Section 102(b) Because the Claimed Invention Was the Subject of Merck's Commercial Offer for Sale More Than One Year Before the '168 Patent Application Was Filed. ...................................21

   1.     The Legal Standard for a Commercial Offer for Sale................................22

   2.     The District Court Erred in Deviating from the Legal Standard for a Commercial Offer for Sale.................................................................................24

   3.     The District Court Erred in Concluding That Merck's Proposed Price, Quantity, Shipping, Payment Terms and Proposed Sale Process Were Insufficiently Definite to be an Offer for Sale under Section 102(b). .............27

   4.     Merck's Signed Written Offer Did Not Violate Section 5.2 of the Non-Disclosure Agreement. .....................................................................................42

C.     The District Court Erred in Finding That Merck Did Not Waive the Right to Insist on Strict Compliance with Section 5.2 of the Non-Disclosure Agreement. ....................................................................................................44

   1.     By Specifying the Procedure for Weider to Complete the Sale, Merck Waived Any Right to Claim That the Transaction Violated Section 5.2 of the Non-Disclosure Agreement..............................................................................44

   2.     The District Court Erred in Finding No Waiver Based on a Finding that the Parties Understood at the Time That a Signed Agreement Was Required. 48

   3.     The District Court Erred as a Matter of Law in Concluding That Waiver Would Defeat the Purpose of Section 5.2. .......................................................49

   4.     The District Court's Conclusion That the Contemporaneous Evidence Showed That Merck Viewed Weider's Acceptance as Merely an Expression of Interest is Legally Irrelevant and Factually Erroneous. .....................................50

D.     The Asserted Claim is Invalid under Section 102(b) Because the Claimed Invention Was Also the Subject of a Commercial Sale by Merck to Weider in September 1998. ...............................................................................................52

CONCLUSION .................................................................................................57

ADDENDUM ..................................................................................................58

PROOF OF SERVICE.........................................................................................59

CERTIFICATE OF COMPLIANCE.......................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*3D Sys., Inc. v. Aarotech Labs., Inc.*,
    160 F.3d 1373 (Fed. Cir. 1998) ...................................................28

*Addicks Servs., Inc. v. GGP-Budgeland, LP*,
    596 F.3d 286 (5th Cir. 2010) ......................................................48

*Anderson v. City of Bessemer City*,
    470 U.S. 564 (1985)................................................20, 37, 41, 51

*Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.*,
    58 F.3d 1227 (7th Cir. 1995) ......................................................26

*Atlanta Attachment Co. v. Leggett & Platt, Inc.*,
    516 F.3d 1361 (Fed. Cir. 2008) ...................................................22

*Baiphore Ford Truck Sales, Inc., v. Ford Motor Co.*,
    380 F.3d 1331 (11th Cir. 2004) ...................................................46

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
    749 F.3d 1349 (Fed. Cir. 2014) ...................................................20

*Cargill, Inc. v. Canbra Foods, Ltd.*,
    476 F.3d 1359 (Fed. Cir. 2007) ...................................................40

*College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*,
    527 U.S. 666 (1999)...................................................................48

*Cucuras v. Sec'y of Dep't Health and Human Servs.*,
    993 F.2d 1525 (Fed. Cir. 1993) ..................................20, 37, 41, 51

*In re Cygnus Telecomms. Tech., LLC, Patent Litig.*,
    481 F. Supp. 2d 1029 (N.D. Cal. 2007).........................................52

*D.L. Auld Co. v. Chroma Graphics Corp.*,
    714 F.2d 1144 (Fed. Cir. 1983) ...................................................22

*Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*,
    554 F.3d 1133 (7th Cir. 2009) ........................................................47

*Dicon, Inc. v. Margen Corp.*,
    618 F.2d 40 (8th Cir. 1980) ..........................................................45

*Fisher-Price, Inc. v. Safety First, Inc.*,
    109 Fed. App'x 387 (Fed. Cir. 2004) ...........................................25

*Goss v. ABN Amro Mortgage Group*,
    549 Fed. App'x 466 (6th Cir. 2013) .............................................57

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
    254 F.3d 1041 (Fed. Cir. 2001) ...........................................*passim*

*H&W Indus., Inc. v. Occidental Chem. Corp.*,
    911 F.2d 1118 (5th Cir. 1990) ..................................................34, 37

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    769 F.3d 1371 (Fed. Cir. 2014) ....................................................23

*Hanford Foundry Do. v. Fuller Co.*,
    38 UCC Rep. Serv. 1553 (E.D. Pa. 1984) ....................................31

*Hamilton Beach Brands, Inc. v. Sunbeam Prods.*,
    726 F.3d 1370 (Fed. Cir. 2013) ........................................21, 22, 25

*Honeywell Int'l Inc. v. Nikon Corp.*,
    672 F. Supp. 2d 638 (D. Del. 2009) ......................................23, 25

*Jaasma v. Shell Oil Co.*,
    412 F.3d 501 (3d Cir. 2005) .........................................................55

*Jarvis v. Ford Motor Co.*,
    283 F.3d 33 (2d Cir. 2002) ...........................................................47

*Kennedy Miller Films PTY Ltd. v. Warner Bros., A Div. of Time Warner Entm't*,
    199 F.3d 1332 (9th Cir. 1999) .....................................................47

*Lacks Indus. Inc. v. McKechnia Vehicle Components USA, Inc.*,
    322 F.3d 1335 (Fed. Cir. 2003) ........................................33, 38, 39

*Lamle v. Mattel, Inc.*,
   394 F.3d 1355 (Fed. Cir. 2005) ....................................................56

*Leader Techs., Inc. v. Facebook, Inc.*,
   770 F. Supp. 2d 686 (D. Del. 2011) ............................................21, 24, 25, 26

*Lehman Bros. Inc. v. Can. Imperial Bank of Commerce*,
   No. 97-8226, 2000 WL 1425098 (S.D.N.Y. Sept. 27, 2000)........................56

*Linear Tech. Corp. v. Micrel, Inc.*,
   275 F.3d 1040 (Fed. Cir. 2001) ............................................................*passim*

*Little Beaver Enterprises v. Humphreys Railways, Inc.*,
   719 F.2d 75 (4th Cir. 1983) ...........................................................46

*Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. Am.*,
   984 F.2d 1551 (10th Cir. 1992) ....................................................44

*Lucent Techs., Inc. v. Netbridge Networks Corp.*,
   168 F. Supp. 2d 181 (D. Del. 2001) ............................................28

*Mac Sales, Inc. v. E.I. du Pont de Nemours & Co.*,
   24 F.3d 747 (5th Cir. 1994) ...........................................................34

*Martin-Janson v. JP Morgan Chase Bank, N.A.*,
   536 Fed. App'x 394 (5th Cir. 2013) ............................................47

*The Medicines Co. v. Hospira Inc.*,
   791 F.3d 1368 (Fed. Cir. 2015) .............................................................21, 22

*Memdata, LLC v. Intermountain Health Care*,
   No. 2:08-CV-190 TS, 2010 WL 1529275 (D. Utah Apr. 15, 2010) .............54

*In re Metro. Intern., Inc.*,
   616 F.2d 83 (3d Cir. 1980) ...........................................................47

*Nat'l Diamond Syndicate, Inc. v. United Parcel Service*,
   897 F.2d 253 (7th Cir. 1990) ................................................................34, 35

*In re New Valley Corp.*,
   89 F.3d 143 (3d Cir. 1996) ...........................................................55

*Nordyne, Inc. v. Int'l Controls & Measurements Corp.*,
   262 F.3d 843 (8th Cir. 2001) ........................................................................28

*Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*,
   298 F. Supp. 2d 281 (D.D.C. 2004)...............................................................45

*Orbis Corp. v. Rehrig Pac. Co.*,
   970 F. Supp. 2d 875 (E.D. Wis. 2013) ..........................................................27

*Pfaff v. Wells Elecs., Inc.*,
   525 U.S. 55 (1998)..............................................................................21, 23, 38

*Plumtree Software, Inc. v. Datamize, LLC*,
   473 F.3d 1152 (Fed. Cir. 2006) ......................................................................22

*Premix-Marbletit Mfg. Corp. v. SKW Chemicals, Inc.*,
   145 F. Supp. 2d 1348 (2001) ..........................................................................30

*RBC Aircraft Prods., Inc. v. Precise Machining & Mfg.*,
   26 F. Supp. 3d 156 (D. Conn. 2014) .......................................................26, 27

*RCA Corp. v. Data Gen. Corp.*,
   887 F.2d 1056 (Fed. Cir. 1989) ......................................................................38

*Rich Prods. Corp. v. Kemutec, Inc.*,
   66 F. Supp. 2d 937 (E.D. Wis. 1999) ......................................25, 26, 27, 30

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,
   249 F.3d 1307 (Fed. Cir. 2001) ......................................................................20

*Scaltech, Inc. v. Retec/Tetra, LLC*,
   269 F.3d 1321 (Fed. Cir. 2001) ......................................................................22

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
   762 F.3d 165 (2d Cir. 2014) ...........................................................................46

*Special Devices, Inc. v. OEA, Inc.*,
   270 F.3d 1353 (Fed. Cir. 2001) ................................................................52, 53

*In re Steele*,
   996 F.2d 311 (10th Cir. 1993) .......................................................................54

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
  939 F.2d 91 (3d Cir. 1991) ............................................................30

*TP Labs., Inc. v. Prof'l Positioners, Inc.*,
  724 F.2d 965 (Fed. Cir. 1984) .....................................................21

*U.S. D.I.D. Corp. v. Windstream Comm'ns, Inc.*,
  775 F.3d 128 (2d Cir. 2014) ..................................................47, 51

*United States v. U.S. Gypsum Co.*,
  333 U.S. 364 (1948)................................................................20, 37

*Westinghouse Elec. Corp. v. Nielsons, Inc.*,
  647 F.Supp. 896 (D. Colo. 1986) ................................................31

*Williams v. Singleton*,
  723 P.2d 421 (Utah 1986)............................................................56

*Winter Panel Corp. v. Reichhold Chemicals, Inc.*,
  823 F. Supp. 963 (D. Mass. 1993).............................................31

*Wis. Knife Works v. Nat'l Metal Crafters*,
  781 F.2d 1280 (7th Cir. 1986) ....................................................45

*Wright Reunstad Props. Ltd. v. U.S.*,
  40 Fed. Cl. 820 (Ct. Cl. 1998) ....................................................35

*Zacharin v. United States*,
  213 F.3d 1366 (Fed. Cir. 2000) ..................................................52

*Zuckerman Spaeder, LLP v. Auffenberg*,
  646 F.3d 919, 923 (D.C. Cir. 2011)............................................48

**State Cases**

*B.R. Woodward Mktg, Inc. v. Collins Food Serv., Inc.*,
  754 P.2d 99 (Utah Ct. App. 1988)...............................................47

*Daines v. Vincent*,
  190 P.3d 1269 (Utah 2008).........................................................55

*Keybank Nat'l Ass'n v. Sys. W. Computer Res.*,
  265 P.3d 107 (Utah Ct. App. 2011).............................................55

*McNeil Eng'g & Land Surveying v. Bennett*,
    268 P.3d 854, (Utah Ct. App. 2011)............................................................55

*Upland Indus. Corp. v. Pac. Gamble Robinson Co.*,
    684 P.2d 638 (Utah 1984)..........................................................................55

*Watkins v. Ford*,
    239 P.3d 526 (Utah Ct. App. 2010), *aff'd*,
    304 P.3d 841, as amended, (Utah 2013)...................................................55

*Wilson v. Johnson*,
    234 P.3d 1156 (Utah Ct. App. 2010) .........................................................57

*Wright v. Commercial And Sav. Bank*,
    464 A.2d 1080 (Md. 1983) ........................................................................33

## Federal Statutes

28 U.S.C. § 1291 .............................................................................................1

28 U.S.C. § 1295(a)(1)......................................................................................1

28 U.S.C. § 1331 .............................................................................................1

28 U.S.C. § 1338 .............................................................................................1

35 U.S.C § 102(b) ................................................................................... *passim*

35 U.S.C. § 271(a) ..........................................................................................28

## Other Authorities

1 *Corbin on Contracts* § 2.2 ...................................................................23, 25

*Restatement (Second) of Contracts* § 24 (1981) ...............................23, 43

*Restatement (Second) of Contracts* § 26, cmt. c (1981) .........................25

*Restatement (Second) of Contracts* § 223 cmt b (1981) .........................55

*Williston on Contracts* § 4:13, at 367 (1990)..........................................23

U.C.C. § 2-202(a)...........................................................................................55

xii

U.C.C. § 2-208(3) ........................................................................44, 45

U.C.C. § 2-209(4) ...............................................................................49

U.C.C. § 2-305 .....................................................................................28

U.C.C. § 2-318 .....................................................................................31

## STATEMENT OF RELATED CASES

No appeal has previously been taken in this action in any court of appeals.

Defendant-Appellant currently is not aware of any other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.  Fed. Cir. R. 47.5.

# JURISDICTIONAL STATEMENT

The United States District for the District of Delaware had jurisdiction of these patent infringement cases under 28 U.S.C. §§ 1331 and 1338.  Following a bench trial, the district court issued an opinion on August 31, 2015, upholding the validity of the asserted patent, as to which infringement was not contested. (A0005–06; A0021.)  The district court subsequently entered final judgments, and Appellant timely filed notices of appeal.  (A0001–04; A0048; A0063.)  This Court has jurisdiction over these appeals from the final judgments of the district court under 28 U.S.C. §§ 1291 and 1295(a)(1).

## STATEMENT OF THE ISSUES

1.     Did the district court err in finding no commercial offer or sale under the on-sale bar of Section 102(b) of the Patent Act, where the material terms of the offer were faxed in a signed writing, in which the patentee expressly offered immediate delivery and invited the buyer to accept the offer for sale in a specific manner, the buyer did so in writing, and the buyer was expecting the promised immediate delivery?

## STATEMENT OF THE CASE

These cases arose under the Hatch-Waxman Act, based on Defendant-Appellant, Watson Laboratories, Inc.'s ("Watson's") filing of Abbreviated New Drug Applications ("ANDAs") and certifications that its proposed products would not infringe any valid claim of U.S. Patent No. 6,441,168 ("the '168 patent"). (A0006–07.)  Plaintiffs-Appellees Merck & Cie, Bayer Pharma AG and Bayer Healthcare Pharmaceuticals Inc. ("Merck") brought suit seeking declaratory relief and an order prohibiting the FDA from approving Watson's proposed products until after expiration of the '168 patent.  (*Id.*)

A bench trial was held from May 18–21, 2015, and the district court issued its opinion on August 31, 2015, finding the patent not invalid.  (A0005–06; A00021.)  Because infringement was not contested, judgment for the patentee was entered shortly thereafter.  (A0001–04.)

## A.    The Asserted Claim of the Patent-in-Suit

The sole asserted claim of the '168 patent is to a particular crystalline calcium salt of a tetrahydrofolic acid.  Specifically, claim 4 of the '168 patent reads:  "A crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.5, 13.3, 16.8 and 20.1 (Type I) said crystalline salt having a water of crystallization of at least one equivalent per equivalent of 5-methyltetrahydrofolic acid."  (A0032 at 10:57–61.)

3

The claimed compound is referred to by several different names throughout the record, including: "Calcium-L-Mefolinate," "5-methyl tetrahydrofolic acid," "MTHF," "5-MTHF," "L-5-MTHF" and "L-5-Methyltetrahydrofolic acid, calcium salt," (hereinafter, "MTHF").

The '168 patent was filed on April 17, 2000. (A0008; A0022.) Accordingly, the latest date for an invalidating offer to sell or sale, under 35 U.S.C. § 102(b), is April 16, 1999.

## B.    Facts

### 1.    Overview

Long before the critical date, Merck set out on a path to commercialize the same MTHF it would later claim in the '168 patent. In 1997, Merck was seeking a strategic partner with which to enter the over-the-counter American vitamin and supplements market. (A0008; A1287 at 714:3–18.) Merck began a dialogue with an American vitamin and nutritional supplement company called Weider Nutrition International ("Weider"). (A0008.) Together, Merck and Weider pursued a broad partnership for research, development, and exclusive marketing of products with ingredients and/or technology supplied by Merck. (*Id.*; A1289 at 720:16–721:19; A1048 at 92:20–93:8; A1439; A1071 at 183:13–185:8; A1435; A1445.) The first proposed joint venture was based on Merck's MTHF. (A1288 at 719:16–720:15; A1434.)

4

MTHF is a crystalline form of the natural isomer of folate produced by the human body. (A1539–40; A1089 at 254:7–11.) The most commonly used over-the-counter sources of folate at the time were folic acid and a B-complex vitamin, which metabolized into the folate used by the body. (*Id.*)

Merck and Weider met several times over the course of 1998 working toward such a joint venture, and identifying other Merck material and/or technology for potential subsequent joint ventures. (A0008; A1289 at 720:16–721:19; A1048 at 92:20–93:8; A1439; A1071 at 183:13–185:8; A1435–37; A1445.) However, Weider decided in August 1998 not to go forward on a joint venture with respect to MTHF. (A0008; A1447.)

In late August and early September 1998, Weider instead asked to purchase two kilograms of MTHF on a stand-alone basis. (A0008; A1447–48; A1419–21.) Weider specifically asked Merck to effect the purchase in the simplest way possible. (A1446.)

By signed fax on September 9, 1998, Merck offered to sell Weider two kilograms of MTHF, at $25,000 per kg, for immediate delivery, freight to be paid by Merck, and payment 60 days net. (A0008; A1386.) The MTHF identified in this fax was the same MTHF later claimed in the '168 patent, and the data attached to a follow-up fax was included in the application for a patent on MTHF. (A0009; A1354–56; A1430; A1353–54; A1357; A0029 at 4:35–46.) Merck further

5

instructed that the simplest way to do the transaction would be for Weider to send a purchase order.  (A1353.)  Weider followed Merck's instruction, and Merck subsequently confirmed placement of the order.  (A0008–09; A1452; A1455.)

Having accepted Merck's written offer, Weider awaited immediate delivery of the MTHF.  (A0009; A1082 at 226:3–7; A1438; A1296 at 749:15–21; A1388.) But Merck delayed shipment as it pursued a more lucrative MTHF deal with a Weider competitor.  (A1398.)  Eventually, Weider requested cancellation of the MTHF order, and Merck proceeded to pursue an exclusive MTHF deal with Weider's competitor.  (A0009; A1463; A1464.)

### 2. Merck's and Weider's Failed Negotiations for an Exclusive Partnership in Research, Development, and Marketing of Merck's New MTHF in Weider Products

The series of meetings between Merck and Weider began in November 1997, when Merck's Dr. Herwig Buchholz visited Weider's Utah research and development center.  (A1367.)  Weider was an American company in the dietary and nutrition supplement business.  (A1068 at 171:6–11.)  Dr. Buchholz was in the research and development group of Merck, focused on pursuing cooperative research and development partnerships to introduce Merck's new compounds and technologies into the dietary supplement market.  (A1287 at 714:3–18.)  On December 7, 1997, Dr. Luke Bucci, Weider's Vice President of Research, faxed

6

Dr. Buchholz to express an interest in MTHF and a desire "to discuss some sort of exclusivity on these products that is mutually satisfactory." (A1367.)

Weider and Merck met again in March 1998, after signing a non-disclosure agreement. (A1457.) They discussed potential joint research, development, and marketing projects. (A1289 at 720:16–721:19; A1439; A1048–49 at 92:20–93:8.) Their focus soon became a co-branding partnership to develop, introduce, and promote new or improved Weider food supplement products containing Merck's MTHF. (A1476; A1363–66; A1432–34; A1440–45.)

At the next meeting in May 1998, Dr. Buchholz was joined by Dr. Roland Martin, the Manager of Merck's Health, Cosmetic, and Nutrition business unit. (*See* A1435.) Dr. Martin's job was marketing and selling Merck's raw materials to be used in over-the-counter dietary supplement products, such as Weider's. (A1046 at 84:1–10.) Dr. Martin provided Weider with a technical specification for MTHF, along with other confidential technical information. (A1366.)

A draft of a formal joint venture and supply agreement granted Weider an exclusive license for the United States, but obligated Weider to spend $2 million in the first nine months to promote products containing the MTHF. (A1376.) On or about August 20, 1998, Weider advised Merck that the required advertising expenditure was too high, and that, accordingly, Weider no longer wished to pursue a joint development venture with exclusive rights. (A1447; A1419.)

7

**3.    Merck Faxes Weider a Signed Offer to Sell 2kg of MTHF, in Response to Weider's Inquiry about a Simple Stand-Alone Purchase.**

Without the prospect of a broad supply and development agreement, Weider asked to purchase two kilograms of MTHF on a stand-alone basis.  (A0008; A1447–48; A1419–1421.)  Weider's Rick Blair had preliminary communications with Dr. Martin by phone and email.  (A1447; A1419.)  By fax of September 2, 1998, James Hines of Weider wrote:

> Thank you for your phone call to Rick Blair of Weider Nutrition.  We are delighted to deal directly with E Merck, Darnstadt.
>
> In order to complete the transaction, we need some information from you and have some to offer.
>
> Needed:      How much will the price be for two kilos?  How would you like to be paid?  Considering that this is a rather small transaction, we would like to do the simplest thing for both companies.
>
> What is the telephone number, address and fax number which will allow us to best contact you?  Since Rick Blair is traveling, for the time being I will act as his contact for you.  My numbers are listed above.  The best and safest fax number is my personal number which is 606-5181 number.

(A1446.)

On September 9, 1998, Dr. Martin responded to Weider's request for the simplest purchase process.  In a signed fax, he wrote:

8

> [R]eferring to [y]our fax of September 2nd and to the
> emails to Rick Blair we would like to handle your
> purchase of [MTHF] very simple.
>
> Therefore, please send the order to my attention and I
> will arrange everything.

(A1386.)

Dr. Martin confirmed in this signed writing the price, shipment terms, and

payment terms, and indicated that Merck could make an "immediate[] delivery" of

two kg (or more) product:

> The price is 25,000 US$ per kg 5-MTHF free delivered
> to your R&D center in the U.S. Payment terms are 60
> days net. With Rick Blair and Richard Bizzaro we
> discussed a purchase of 2 kg 5-MTHF. If you need more,
> we have no problem for an immediately [sic] delivery.

(*Id.*)  Dr. Martin testified that at the time, this would have been Merck's first sale

of MTHF.  In his words, the $50,000 was a "huge amount of money" and

"important for Merck."  (A1053 at 110:11–22.)

### 4. Weider Accepts the Offer in the Manner Prescribed by Merck, and Merck Confirms the Offer and Sale.

On September 16, 1998, Weider's purchasing manager, Gary Jepson,

responded to Dr. Martin, accepting the offer and Merck's simplified procedure to

consummate the deal:

> We will order 2 KG of the material against PO#29337 for
> delivery to: Weider Nutrition Group, 2002 South 5070
> West, Salt Lake City, UT 84104.

9

> Please reference the PO number on all paperwork and be
> sure to include a packing list with the shipment.

(A1352.)  Weider issued a purchase order.  (A0009; A1452.)  Mr. Jepson also

asked for both the administrative and technical information Weider need to fill out

the purchase order:  "[1] specification sheet for the raw material outlining physical,

analytical, and microbial characteristics; [2] certificates of analysis; [and 3]

material safety data sheets."  (A1352.)  Merck provided that safety and technical

data.  (A1355–57.)

In the meantime, Merck moved forward internally with the sale.  Dr. Martin

directed shipment of the stand-alone order without a comprehensive supply

agreement.  (A1419–21.)  He explained to his colleagues:

> No supply agreement whatsoever exists with Weider for
> L-5-MTHF, and the conclusion of such an agreement is
> no longer planned.

(A1421.)  Dr. Martin then instructed his colleagues on how to execute the sale:

> A specification for [MTHF] was given to Weider. . . .
> This specification should be attached to the order
> confirmation, along with the note that with respect to
> patent infringement and toxicology the product will be
> used at Weider's risk.

(*Id.*)  Dr. Martin also articulated to his colleagues the information needed internally

to process delivery of the order.  (*Id.*)  These nine items included technical, safety,

and stability data for MTHF.  (*Id.*)  Dr. Martin's colleagues provided all nine items

to him on September 21, 1998.  (A1465.)  The checklist for delivery was complete.

10

Dr. Martin's September 25, 1998 fax to Mr. Jepson of Weider confirmed that the product to be sold was MTHF from Lot number ESF-118, which was undisputedly the MTHF of claim 4 of the '168 patent. (A0009; A1354–56; A1430.) In fact, the powder x-ray diffraction data in Example 2 of the '168 patent—including all of the 2-theta values recited in claim 4—came from the very lot subject to Merck's offer and sale to Weider. (A0009; A0029 at 4:35–46; A0032 at 10:57–61; A1355; A1430.)

In this fax, Dr. Martin also reiterated terms of the offer and sale to Weider, and wrote that "we have checked the easiest and quickest way to deliver the Calcium L-5-Methyltetrahydrofolate to you." (A1353.) The "quickest way" was for Merck's Eprova group in Switzerland to handle the shipment directly. (*See id.*) On the next business day, Mr. Jepson of Weider replied by email that he would coordinate directly with Eprova. (A1452.)

The following week, on October 8, 1998, Merck's Dr. Buchholz again confirmed the two-kilogram stand-alone order in a letter to Weider: "Initially Weider expressed the wish for an exclusive license on this product, further meeting showed that a nonexclusive status is preferred. A first order for 2 kg was placed." (A1455.)

11

**5.    Merck Delays Delivery to Pursue a More Lucrative Deal with Weider's Competitor, and Weider Raises the Delay with Merck.**

Shortly after confirming and preparing to ship Weider's order, and still well before the critical date, Merck met with a Weider competitor, Whitehall Robbins ("Whitehall"), and the University of Alabama to pursue an exclusive MTHF deal. (A1398.)  Of course, Merck's promised delivery of MTHF to Weider would have been flatly inconsistent with the proposed exclusivity of the Whitehall deal.  As Dr. Martin reported within Merck:  "Whitehall Robbins (AHP) was considered the ideal partner with its very successful multivitamin preparation Centrum (replacing folic acid with [MTHF])."  (*Id.*)

In October 1998, Dr. Martin received a draft license from the University of Alabama and worked on coming to exclusive terms with Whitehall.  (A1475.)  In a meeting on October 21, 1998, Whitehall made clear that it would require the *exclusive* rights to MTHF in the United States and Canada, in exchange for its commitment to Merck.  (A1461–62.)  On November 4, 1998, Dr. Martin then sent Whitehall a proposal offering the exclusive right to sell MTHF-containing products in the United States.  (A1406–07.)  The proposal contemplated that Whitehall would purchase three to five metric tons (3,000 to 5,000 kgs) of MTHF—that is, at least approximately 1,500 times bigger than the two-kg Weider order.  (A1407.)

Meanwhile, back in Utah, Weider was still expecting delivery of the two kg of MTHF.  Dr. Bucci's unchallenged testimony is that Weider "did expect to

receive two kilograms from Merck" in the fall of 1998. (A1082 at 226:3–7.) By mid-November, Weider had become concerned enough to put the late delivery on the agenda for a meeting with Merck on December 15, 1998: "We need to track our order and determine delivery date." (A1438.)

When Weider raised the missed delivery with Merck at the December meeting, Merck played for time. According to the meeting minutes, Merck now claimed that it did not know where the order was, but said that it would "try and locate the order." (A1388.) The meeting minutes do not reflect any other explanation offered by Merck for the delay. (*Id.*)

Just a few days before the December 15, 1998 meeting with Weider, Merck's negotiations with Whitehall had proceeded to an exchange of term sheets. (A1425–27.) Merck continued to play for time. A January 6, 1999 internal Weider email from Mr. Jepson reports that Merck "is asking about whether the [purchase order] for MTHF is active." (A1428.) And a Weider employee wrote in another subsequent email that Merck's Dr. Lutz Thomas had claimed (for the first time) at the December meeting that "Merck wasn't expecting us to buy any immediately." (*Id.*)

On January 9, 1999, Dr. Bucci notified Merck by email that Weider had decided to cancel its order. He emailed that "it was decided by a mutual decision to cancel our existing order for [MTHF]." (A1463.) Dr. Lutz Thomas replied to

the email:  "We are of course sorry about your decision, but we still feel that there is plenty of opportunity for our companies to work together."  (A1464.)

## C.     The District Court's Decision

The district court's decision consisted of findings of fact, a recitation of the parties' contentions, and conclusions of law.  (*See* A0008–13.)

### 1.     The District Court's Findings of Facts

With respect to the signed September 9, 1998 fax from Dr. Martin, the district court found that it contained "price, quantity, delivery, and payment" terms for the purchase.  (A0008.)  The court also recognized the fact that Merck's fax followed Weider's August 1998 inquiry "about a stand-alone purchase of two kilograms of MTHF."  (*Id.*)  Yet the court concluded, as a matter of law, that material industry-standard terms (*i.e.*, liability apportionment) were missing.  (A0012–13.)

The court did not mention the undisputed evidence of the contemporaneous documents that:  (a) Weider requested that the transaction be completed in the simplest way possible; (b) Merck responded by specifying that Weider needed only to send the order to Dr. Martin, and that Merck could make immediate delivery; and (c) Merck confirmed receipt of Weider's order.  (A0008–12.)  The court likewise failed to acknowledge the unchallenged testimony of Weider that it was expecting the promised immediate delivery in the Fall of 1998.  (*Id.*)

14

The court relied heavily on Section 5.2 of the non-disclosure agreement signed by Merck and Weider at the outset of their joint venture discussions.  (*See* A0012.)  That section provided:  "Unless and until such definitive agreement regarding a transaction between Weider and Merck has been signed by both parties, neither party will be under any legal obligation of any kind with respect to such a transaction."  (A0008.)  However, the court never made a finding as to what "such a transaction" meant in terms of the non-disclosure agreement.

Finally, the court did not make any factual findings as to the toxicity or safety of MTHF, despite its legal conclusion that additional material terms were necessary for a commercial offer or sale of "a potentially dangerous new drug." (A0012–13.)

## 2.    The District Court's Conclusions of Law

The district court found that there had not been an invalidating sale or offer for sale, based on two conclusions of law.  (A0009–13.)

First, the court found that Merck's September 9, 1998 fax was insufficiently definite to constitute an offer under the controlling federal general contract law. (A0012–13.)  As a matter of law, the court found insufficient the undisputed price, quantity, shipping, and payment terms, with promised immediate delivery and instructions on how to execute the sale in the simplest way possible.  (*Id.*)

The court based its decision on a new, unprecedented rule for a new class of contracts pertaining to "potentially dangerous new drugs." (A0012–13.) The court neither defined this special class of contracts, nor made any findings as to why over-the-counter MTHF would be subject to this new class of contracts. (*Id.*) The court simply stated: "It seems to me that determining liability appointment for a potentially dangerous new drug would be very important to a sale." (A0012.) The court did not cite any authority in support of its conclusion.

Second, the court found that Section 5.2 of the non-disclosure agreement precluded any sale, or offer for sale, because it required "such definitive agreement . . . signed by both parties" to form a legally binding contract. (A0012.) The court provided no reasoning as to why Merck's September 9, 2008 signed fax was not an offer under Section 5.2 (*i.e.*, a definitive writing that could have been counter-signed to form a legally binding agreement)—other than that industry-standard terms were supposedly missing. (*Id.*) Moreover, although the court acknowledged Watson's legal argument that Merck had waived its right to seek enforcement of Section 5.2 for the stand-alone purchase, the court concluded: "I do not think that Merck waived § 5.2." (*Id.*) Again, the court failed to cite any supporting authority. The court also implicitly rejected Watson's legal argument that Merck and Weider's exchanged signed writings satisfied the requirements of Section 5.2, to the extent it applied and had not been waived. (*Id.*)

16

## SUMMARY OF THE ARGUMENT

Asserted claim 4 of the '168 patent is invalid under the on-sale bar of Section 102(b) of the Patent Act.  Merck made a commercial offer to sell the claimed compound more than one year before the application date of the '168 patent.  Merck made the offer in a September 9, 1998 signed fax to Weider, specifying all material terms of the sale, including quantity, price, payment terms, and delivery.  It is undisputed that the MTHF specified in Merck's fax was the material of claim 4.  Further, Merck expressly instructed Weider how to effectuate the sale.  Thus, Merck's definitive signed offer should have been invalidating on its own, notwithstanding Section 5.2 of the non-disclosure agreement.  Weider also accepted the offer in writing as well as by placing an order and by following Merck's proffered instructions.

The district court erred in ignoring the commercial reality of Merck's attempt to profit from the commercial use of its invention more than a year before filings its patent application.  Merck admitted that the $50,000 sale to Weider would have been its first sale of MTHF, and therefore was "huge" and "important for Merck."  In its signed fax, Merck sought to sell the claimed product with the kind of terms that this Court has consistently recognized as sufficient for a commercial offer.  Merck specifically instructed Weider how to accept the offer, and Weider accepted in the manner specified by Merck.  The district court's legal

conclusion of no commercial offer or sale was therefore legally erroneous on multiple fronts.

First, the court erred as a matter of law in finding insufficient evidence of an invalidating offer to sell where the language, terms, and circumstances of Merck's offer more than satisfied the legal test articulated and applied by this Court to date. By concluding there was no offer where Merck's fax—in response to Weider's purchase inquiry—presented explicit price, quantity, delivery, and payment terms, the court erred in deviating from that rule of law. It also erred in requiring additional material terms (*i.e.*, liability apportionment) based solely on one fact witness's testimony, which was contradicted by the contemporaneous documents.

Second, the court failed to recognize that Merck's signed written offer complied with Section 5.2 of the non-disclosure agreement, to the extent that section applied. Merck's fax included the definitive terms of the offer and was signed by Dr. Roland Martin. Nothing more was required. Had Weider returned the fax with a counter-signature accepting the terms, the parties would have had a "definitive agreement . . . signed by both parties." Merck's fax was the epitome of a commercial offer—and one that met Section 5.2's signed writing requirement. Merck's September 1998 commercial offer and exploitation of its MTHF compound should have invalidated its subsequent patent claim to that same compound, as a matter of law.

18

Third, the court erred as a matter of law in finding no waiver of Merck's right to insist on strict compliance with Section 5.2 in light of the undisputed contemporaneous documentary evidence. It is a bedrock principle of contract law that a party can waive its right to strict enforcement of a provision by conduct inconsistent with claiming that right. In response to Weider's request to handle the sale as simply as possible, Merck's express instruction to Weider to effect the transaction by sending an order to Dr. Martin was plainly inconsistent with any intent to insist on a different "definitive agreement" under Section 5.2 in order to make the sale. Merck cannot disavow the existence of its commercial offer fifteen years later for the sole purpose of seeking to avoid the on-sale-bar.

Finally, given the invalidating effect of Merck's commercial offer, whether a commercial sale occurred, under Section 5.2 or otherwise, does not matter. But in deciding that issue, the court compounded its error. Merck's and Weider's dealings here, as evidenced by the contemporaneous documents, showed that there was indeed an invalidating sale, despite Merck's efforts to twist Section 5.2 of the non-disclosure agreement and the commercial reality in 1998.

For these reasons, the judgment should be reversed.

# ARGUMENT

## A.    Standard of Review

On appeal from a bench trial, this Court reviews a district court's legal determinations *de novo* and factual findings for clear error. *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1358 (Fed. Cir. 2014). Invalidity under the on-sale bar is a question of law with underlying questions of fact. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1310 (Fed. Cir. 2001). The question of law is reviewed *de novo*, while the underlying findings of facts are reviewed for clear error.

Clear error exists when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985). "Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible that a reasonable fact finder would not credit it. Where such factors are present, the court of appeals may well find clear error in a finding purportedly based on a credibility determination." *Id.* at 575; *see also United States v. U. S. Gypsum Co.*, 333 U.S. 364, 396 (1948); *Cucuras v. Sec'y of Dep't Health and Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

**B.**  **The Asserted Claim is Invalid under Section 102(b) Because the Claimed Invention Was the Subject of Merck's Commercial Offer for Sale More Than One Year Before the '168 Patent Application Was Filed.**

Under Section 102(b) of the Patent Act, a claimed invention is invalid if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C § 102(b).  The on-sale bar applies when two conditions are satisfied before the critical date:  (1) the claimed invention must be the subject of a commercial sale or offer for sale, and (2) the invention must be ready for patenting at the time.[1]  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998); *Hamilton Beach Brands, Inc. v. Sunbeam Prods.*, 726 F.3d 1370, 1374 (Fed. Cir. 2013).

Once a defendant demonstrates a *prima facie* case of invalidity based on the on-sale bar, the burden shifts to the patent holder to "come forward with convincing evidence to counter that showing."  *TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971 (Fed. Cir. 1984); *Leader Techs., Inc. v. Facebook, Inc.*, 770 F. Supp. 2d 686, 712 (D. Del. 2011), *aff'd*, 678 F.3d 1300 (Fed. Cir. 2012).

As this Court repeatedly has emphasized, the purpose of the on-sale bar is "to preclude attempts by the inventor or his assignee to profit from commercial use of an invention for more than a year before an application for patent is filed."  *The*

---

[1] The district court found that the invention was ready for patenting in September 1998.  (A0008.)

21

*Medicines Co. v. Hospira Inc.*, 791 F.3d 1368, 1371 (Fed. Cir. 2015) (quoting *D.L. Auld Co. v. Chroma Graphics Corp.*, 714 F.2d 1144, 1147 (Fed. Cir. 1983)); *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006).

As set forth in detail below, here Dr. Martin's fax of September 9, 1998 was a commercial offer for sale for the MTHF compound of claim 4. Indeed, it was the archetypical detailed and customer-specific offer for sale held by this Court to be invalidating under Section 102(b). *See, e.g.*, *Hamilton Beach*, 726 F.3d at 1376–77. That commercial offer should have been conclusive of invalidity. In any event, as discussed in Section D, *infra*, a commercial sale also occurred when Weider accepted Merck's terms in writing and followed the instructions in Dr. Martin's fax.

### 1.    The Legal Standard for a Commercial Offer for Sale

An offer for sale need not be accepted in order for the on-sale bar to apply. *See, e.g.*, *Scaltech, Inc. v. Retec/Tetra, LLC*, 269 F.3d 1321, 1328 (Fed. Cir. 2001). The offer itself is invalidating so long as it is "sufficiently definite that another party could make a binding contract by simple acceptance." *Hamilton Beach*, 726 F.3d at 1374–75 (quoting *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008)). "[T]he question of whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be

analyzed under the law of contracts as generally understood." *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001); *Pfaff*, 525 U.S. at 67.

For the meaning of "commercial offer for sale" under Section 102(b), this Court looks to a variety of sources, including the Uniform Commercial Code ("UCC"), the *Restatement (Second) of Contracts*, *Corbin on Contracts*, and the common law. *See, e.g.*, *Grp. One*, 254 F.3d at 1047–48 (citing all three sources with approval). The Court, however, has not placed any one source above all others, and has declined to "offer rules or even binding guidance" for determining what is and is not an "offer for sale." *Id.* at 1048.

Most of these sources overlap in describing an offer as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001) (quoting *Restatement (Second) of Contracts* § 24 (1981)). *See also Williston on Contracts* § 4:13, at 367 (1990); *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1381 (Fed. Cir. 2014); *Honeywell Int'l Inc. v. Nikon Corp.*, 672 F. Supp. 2d 638, 642 (D. Del. 2009), *aff'd sub nom. Honeywell Int'l, Inc. v. Nokia Corp.*, 400 F. App'x 557 (Fed. Cir. 2010). "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple

acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Grp. One*, 254 F.3d at 1048.

Determining whether "a communication or series of communications rises to the level of a commercial offer for sale" requires consideration of both (a) the language of the communications, and (b) the circumstances surrounding the making of the alleged offer. *Id.* at 1047–48; *Leader Techs.*, 770 F. Supp. 2d at 723; *Honeywell*, 672 F. Supp. 2d 638 at 642–43.

## 2. The District Court Erred in Deviating from the Legal Standard for a Commercial Offer for Sale.

The district court first erred in not considering the language of the alleged offer, Dr. Martin's fax of September 9, 1998, and follow-up fax of September 25, 1998.

The language of these faxes is not conditional or speculative. Rather, it is language of committal: "[W]e would like to handle your purchase of [MTHF] very simple. Therefore, please send the order to my attention and I will take care of everything. . . . After receiving your order you will get the confirmation of the order." (A1386.) Similarly, Dr. Martin wrote: [W]e have checked the easiest and fastest way to deliver the [MTHF] to you. . . . Therefore we would appreciate it decided that the EPROVA should ship and invoice directly to you." (A1353.) This is the kind of language this Court finds definitive of an offer, as opposed to a mere expression of interest, advertising, or general solicitation. *See Grp. One*, 254

24

F.3d at 1048 ("Language suggesting a legal offer, such as 'I offer' or 'I promise' can be contrasted with language suggesting more preliminary negotiations, such as 'I quote' or 'are you interested.'"); *Hamilton Beach*, 726 F.3d at 1376–77 (finding the product supplier's response that it was "*ready to fulfill* the order upon [the buyer's] 'release'" to be an invalidating commercial offer for sale.).

The district court further erred in ignoring the first three of the four circumstances surrounding the offer, which this Court has articulated as a matter of law:  "[1] the context of any prior communications or course of dealing between the parties; [2] whether the communication was private or made to the general public; [3] whether the communication comes in reply to a specific request for an offer; and [4] whether the communication contains detailed terms."  *Leader Techs.*, 770 F. Supp. 2d at 723–24; *Honeywell*, 672 F. Supp. 2d at 643.  *See also Fisher-Price, Inc. v. Safety First, Inc.*, 109 Fed. App'x 387, 392 (Fed. Cir. 2004) (citing 1 *Corbin on Contracts* § 2.2 and *Restatement (Second) of Contracts* § 26, cmt. c (1981)) (A1492).

As a matter of law, each of the three factors overlooked by the district court supports the existence of a commercial offer for sale.  The parties' prior communications and course of dealings with respect to MTHF had been extensive.  Merck and Weider had been discussing and exchanging technical information about MTHF for months.  *See Rich Prods. Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d

937, 956–957 (E.D. Wis. 1999), *aff'd*, 241 F.3d 915 (7th Cir. 2001); *RBC Aircraft Prods., Inc. v. Precise Machining & Mfg.*, 26 F. Supp. 3d 156, 177–78 (D. Conn. 2014).  Further, as Dr. Martin noted, they had decided not to enter a formal supply agreement, and did not plan on entering one for the stand-alone purchase.  Merck's offer was made privately, only to Weider.  *See Rich Prods.*, 66 F.Supp.2d at 957; *RBC Aircraft*, 26 F. Supp. 3d at 177–178.  Also, the offer came in reply to a specific request for an offer.  *See Id.*

Finally, Dr. Martin's fax was detailed with respect both to the essential terms, and the way in which Merck wanted Weider to accept the offer.  The September 9, 1998 fax contained all the essential terms that courts find to be sufficient for commercial offers for sale:  (1) a description of the product to be sold (MTHF); (2) the quantity of the goods (2 kg); (3) the price of the goods ($25,000 per kg); (4) delivery information ("free delivered to your R&D center in the U.S."); and (5) payment terms ("Payment terms are 60 days net").  (A1386.)

This Court and courts around the country have consistently found these terms to be the pillars of an offer for sale.  *See, e.g.*, *Linear Tech.*, 275 F.3d at 1052 (quantity terms and identification of product were sufficiently definite to create enforceable contract); *Architectural Metal Sys., Inc. v. Consolidated Sys., Inc.*, 58 F.3d 1227 (7th Cir. 1995) (price quotation specifying items to be sold, the quantity and price of each item, and the delivery terms constituted an offer); *Rich Prods.*, 66

F. Supp. 2d at 957 (price, quantity, description, delivery and payment terms sufficiently definite for offer); *Orbis Corp. v. Rehrig Pac. Co.*, 970 F. Supp. 2d 875, 881–82 (E.D. Wis. 2013) (price quotation specifying items to be sold, the quantity and price of each item, and the delivery terms constituted an offer); *RBC Aircraft*, 26 F. Supp. 3d at 177–78 (price quotation specifying items to be sold, the quantity and price of each item, and the delivery terms constituted an offer).

**3.    The District Court Erred in Concluding That Merck's Proposed Price, Quantity, Shipping, Payment Terms and Proposed Sale Process Were Insufficiently Definite to be an Offer for Sale under Section 102(b).**

**(a)    Watson Is Not Aware of Any Decision to Find the Level of Detail in Merck's Fax Insufficient to Constitute a Commercial Offer for Sale.**

The district court erred in concluding that the controlling federal common law of contract offers requires more than the identity, price, quantity, delivery and payment terms, as well as express instructions as to how to make the purchase—all at the request of the buyer.

Watson is not aware of any decision in which this Court has found such a document insufficient definite to constitute an offer for sale under Section 102(b). Indeed, Watson is not aware of any decision in which *any* court has found such a document insufficient to constitute an offer under any law of contract.

To the contrary, this Court confirmed in *Linear Tech. Corp. v. Micrel, Inc.*, 275 F.3d 1040 (Fed. Cir. 2001), that even fewer terms than were present in

Merck's offer to Weider create a sufficiently definite offer.  In *Linear Tech.*, the

Court analyzed whether submitted purchase orders were offers under the on-sale

bar of Section 102(b).  The Court looked to the UCC, and concluded that they were

offers even though they did not include a price term:

> The purchase orders contained sufficiently definite terms to
> create an enforceable contract upon acceptance under the
> UCC; they included quantity terms and clearly identified the
> requested product.  True, they did not specify a price, but the
> UCC does not require price terms to create a binding
> contract.  *See* U.C.C. § 2-305.

*Linear Tech.*, 275 F.3d at 1052.  *See also Nordyne, Inc. v. Int'l Controls &*

*Measurements Corp.*, 262 F.3d 843 (8th Cir. 2001) (quotation including quantity,

price, time in which to accept, shipping and payment terms sufficiently definite to

constitute offer under *Restatement (Second) of Contracts*)).

In the context of Section 271(a) of the Patent Act (defining an "offer to sell"

patented inventions in the U.S. as an act of infringement), this Court has held that

less-detailed written quotes than here constitute "offers to sell," even where the

quotes declared on their faces that they were not offers.  *3D Sys., Inc. v. Aarotech*

*Labs., Inc.*, 160 F.3d 1373, 1379–80 (Fed. Cir. 1998).  This Court held that to treat

these less-detailed quotes "as anything other than offers to sell would be to exalt

form over substance."  *Id.*; *see also Lucent Techs., Inc. v. Netbridge Networks*

*Corp.*, 168 F. Supp. 2d 181, 227–28 (D. Del. 2001).

**(b)     The District Court Deviated from the Uniform Federal Common Law of Contracts to Create a Special Rule for an Arbitrarily Defined Group of "Potentially Dangerous New Drugs" in the Nutritional Supplement Industry.**

The district court here ruled as a matter of law that the material terms otherwise found by this Court as sufficient for an offer were not sufficient in this case because it involved "a potentially dangerous new drug."  Without citing any authority, the court concluded:  "It seems to me that determining liability apportionment for a potentially dangerous new drug would be very important to a sale."  (A0012.)  It then implicitly found that a liability term would be essential for any offer of such a drug to be sufficiently definite, citing unspecified testimony from Dr. Buchholz.[2]  (A0011–13.)

There are several reasons why this Court should reject the district court's new rule of contract law that for a class of goods called "potentially dangerous new drugs," unspecified terms relating to safety and liability are needed beyond price, quantity, shipping and payment in order to have an offer under Section 102(b).

---

[2] The claimed invention does not include any use limitations.  (*See* A0032 at 10:57–61.)  To the extent the district court imported such use limitations into the claim in concluding that materials terms were missing from Merck's offer, it was legal error.

29

### (i)     The District Court's Deviation from the Federal Common Law of Contract Offers Is Unprecedented.

The district court's deviation from the general contract law to require new, unspecified, "industry-specific" terms is unprecedented as a matter law.  The district court's failure to cite any authority for this proposition is not surprising.  Watson is not aware of even one court to have so held for any industry or kind of goods, much less for any invention that the patentee declares at trial to be "a potentially dangerous new drug."

To the contrary, courts recognize that buyer and seller liability are not essential terms to an offer for sale under the UCC, but rather terms for which the UCC provides "gap-filling" default rules.  Terms such as "warranty and remedy provisions, choice-of-law clauses, cancellation provisions, statements regarding additional or different terms, etc. . . . are terms which either the UCC of the common law provide as 'gap-fillers.'  'Gap-fillers' are – by definition – unnecessary for a document to serve as an offer."  *Rich Prods.*, 66 F.Supp. 2d at 957; *see Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 100 (3d Cir. 1991) (absence of warranty terms immaterial in light of UCC's gap-filling provisions).

Where the parties have not expressly agreed on liability terms, or have exchanged conflicting versions of such terms, the UCC supplies those "gap-filling" terms.  *See, e.g.*, *Premix-Marbletit Mfg. Corp. v. SKW Chemicals, Inc.*, 145 F. Supp. 2d 1348, 1358 (2001) (applying UCC gap-filling warranty provisions as

term of contract); *Winter Panel Corp. v. Reichhold Chemicals, Inc.*, 823 F. Supp. 963, 969 (D. Mass. 1993) (UCC provides seller liability to seller for consequential damages from breach or breach of warranty); *Westinghouse Elec. Corp. v. Nielsons, Inc.*, 647 F.Supp. 896, 901 (D. Colo. 1986) (applying gap-filling UCC liability provisions where liability terms of quote and response conflicted); *Hanford Foundry Do. v. Fuller Co.*, 38 UCC Rep. Serv. 1553, 1557 (E.D. Pa. 1984) (conflicting liability disclaimer provision cancel out; consequential damages may be collected under UCC §§ 2-714 and 2-715).

Sections 2-703 through 2-710 of the UCC provide the terms of the buyer's liability to the seller for breach. *See* U.C.C. §§ 2-703–2-710. And Sections 2-711 through 2-716 provide the terms of the seller's liability to the buyer. *See* U.C.C. §§ 2-711–2-716. Further, Section 2-318 of the UCC provides gap-filling terms for liability to third parties injured by the goods. *See* U.C.C. § 2-318. For example, New York's gap-filling section provides: "A seller's warranty whether express or implied extend to any natural person if it is reasonable to expect that such person may use, consumer or be affected by the goods and who is injured by breach of the warranty. A seller may not exclude or limit the operation of this section." N.Y. McKinney's Uniform Commercial Code § 2-318.

Neither the court nor Merck said exactly what allegedly essential liability term(s) was missing. Yet it is readily apparent that the UCC gap-filling provisions

supply precisely the type of liability apportionment that Merck thought appropriate for MTHF. Specifically, the "Warranty/Limitation of Liability" section from the draft comprehensive joint supply and development agreement—which Merck sent before Weider abandoned the joint venture—deals with exactly the same kinds of warranties and seller's remedies covered in the UCC gap-filling sections. *Compare* (A1379) *with* U.C.C. §§ 2-711–2-716 and §§ 2-703–2-710.

The district court did not make the factual findings that would be required under its deviation from the law of contracts, even if supported by precedent. (*See* A0007–09.) In particular, it did not make any findings as to the supposed dangerousness of MTHF, based on any scientific criteria or evidence. (*Id.*) The evidence in the record is that MTHF is merely a crystalline form of the natural isomer of folate found in the human body. (A1089 at 254:7–11.) As Merck represented to the court, "It is sold as a folate supplement, similar to folic acid in most people's understanding." (A1035 at 38:2–4.) It is what the body produces upon digesting folic acid, one of the B-complex vitamins (B12) common for decades in multivitamins and nutritional supplements. (A1484; A1539–40.) Merck promoted it as a more healthful and effective source of folates, and promoted its substitution for folic acid in multivitamins. (A1387; A1434.) At the time Merck sought to bring MTHF to the market with Weider, Merck was tracking its competitor BASF's introduction of nutritional supplements containing folates.

32

(A1484.)  Dr. Martin never referred to MTHF as a potentially dangerous drug.

Nor, in fact, did Dr. Buchholz.

Indeed, before hinting vaguely about unknown and unspecified safety

concerns, Dr. Buchholz acknowledged:  "Folates are derivatives of folic acid. Folic

acid is like a vitamin.  Essentially, you have to eat it.  It has health benefits and you

have to use folic acid to stay healthy.  Actually, it's that important that I think in

the United States, food is fortified with folic acid."  (A1289 at 722:11–21.)

> **(ii)** **The District Court Failed to Cite Any Cognizable Evidence of Industry Custom Required by Its Deviation From the Federal Common Law of Contract Offers.**

The district court did not cite any legally cognizable evidence of industry

custom, or even a definition of the industry (of "potentially dangerous new

drugs").  This Court has not directly addressed the kind of evidence required to

establish industry custom for an offer under Section 102(b).  However, the Court

acknowledged the insufficiency of a party's mere say-so that "th[is] is how

business is done in the . . . industry." *Lacks Indus. Inc. v. McKechnia Vehicle*

*Components USA, Inc.*, 322 F.3d 1335, 1348 (Fed. Cir. 2003).

Courts that regularly apply these contract principles require evidence not just

of what is done by the entity seeking to invoke industry custom, but rather

admissible evidence of what is done throughout the industry.  *See, e.g.*, *Wright v.*

*Commercial And Sav. Bank*, 464 A.2d 1080, 1083–84 (Md. 1983) ("[T]he bank

was required to produce evidence of a practice common to the banking industry

rather than proof of a mere routine or usual procedure at the subject bank."); *Mac*

*Sales, Inc. v. E.I. du Pont de Nemours & Co.*, 24 F.3d 747, 752 (5th Cir. 1994)

("[T]he only evidence offered by du Pont is that du Pont—not the entire industry

or trade—unilaterally required [the alleged industry custom or practice]").  As the

Fifth Circuit has explained:

> To establish "regularity of observance," the proffering
> party must demonstrate a dominant pattern of use within
> the industry.  The testimony of one officer as to that
> company's practices is generally insufficient to establish
> such a pattern.

*H&W Indus., Inc. v. Occidental Chem. Corp.*, 911 F.2d 1118, 1122 (5th Cir. 1990).

"[A] usage or custom to be binding must be so uniform, long-established and

generally acquiesced in and so well known as to induce the belief that the parties

contracted with response to it . . . ."  *Nat'l Diamond Syndicate, Inc. v. United*

*Parcel Service*, 897 F.2d 253, 260–61 (7th Cir. 1990).  Accordingly, "[e]vidence of

an industry custom should in many cases be presented by several witnesses so as to

establish the general knowledge and acceptance of the purported custom or

usage . . . ."  *Id.*

Courts uniformly reject the conclusory testimony of a single party witness,

and generally require testimony from multiple witnesses or expert testimony of the

industry.  *See*, *e.g.*, *Nat'l Diamond Syndicate*, 897 F.2d at 260–61 (rejecting party

employee's reference to an alleged "industry practice," where employee was not qualified to testify about practice across the industry, and did not even specify the particular industry); *Wright Reunstad Props. Ltd. v. U.S.*, 40 Fed. Cl. 820, 826 (Ct. Cl. 1998) ("The existence of a trade practice can only be proven by instances of actual practice and not by the opinion of a witness alone."). Yet the conclusory testimony of a single fact witness (Dr. Buchholz of Merck) is exclusively what the district court appeared to rely on here. (A0011–13.)

Dr. Buchholz was not offered as an expert witness. (A1009 at 31:14–17.) There is no evidence that Dr. Buchholz had any knowledge of the essential terms of stand-alone sales of nutritional supplement material outside of Merck—or, indeed, even inside Merck. There is no evidence that he had any knowledge of how such transactions were done by, for instance, Weider's other suppliers, or Merck's competitors like BASF. He did not provide any evidence of any written offers for stand-alone sales from others in the nutritional supplement industry, or any other industry. Nor did he offer any evidence of such offers made by Merck in the nutritional supplements industry.

Within Merck, Dr. Buchholz's personal experience and responsibility was not in Merck's stand-alone sales of any product to the nutritional supplement industry. (A1291 at 728:24–729:15.) His responsibility was with respect to "technology developments, so agreements like joint development agreements, like

35

research and development agreements, like material transfer agreements is

something I was negotiating." (A1291 at 728:24–729:9.) "[T]he business was

done by the business unit," as he explained, "So anything with regard to supplying

or factually making the business is the responsibility of the business unit to

negotiate an agreement, signed agreement." (*Id.* at 729:10–15.) With respect to

MTHF and nutritional supplements, the relevant business unit was Dr. Martin's

Nutritional Product Unit. It was Dr. Martin, not Dr. Buchholz, who handled

negotiating the supply of materials for Merck's customers in the nutritional

supplements industry. (A1046 at 84:4–10.) Merck, however, refused to bring Dr.

Martin to trial. (A1011 at 38:9–11.)

When asked for his knowledge of industry standard terms for a contract

beyond price and quantity, Dr. Buchholz vaguely opined "you have logical things.

In this case for instance, are very important. Is the product safe? You have

regulations on liability. You have sometimes regulation how supply is done. There

are many other things than just price and quantity." (A1291 at 729:16–730:3.) As

a matter of law, however, Dr. Buchholz was not asked to opine on what contract

terms are recognized as essential to an offer in the industry, so as to cause the

recipient to reasonably expect that acceptance will conclude the deal. Instead, he

testified that it was Merck's practice to have formal agreements, and that those

formal agreements had "many other things" than price and quantity, including

liability allocation.  (A1291 at 729:16–730:3.)  Although this may be true for Merck's normal practice, it is not evidence of what was standard in the nutritional supplement industry outside Merck.

Accordingly, Dr. Buchholz's testimony was legally irrelevant insofar as it was not evidence of what the industry practiced.  It was error for the district court to accept Merck's alleged practice as industry custom.  *See, e.g.*, *H&W Indus.*, 911 F.2d at 1122.

Even if, however, Merck's practice were legally sufficient, the court still erred in relying on Dr. Buchholz's testimony because he squarely contradicted the contemporaneous documents—this was not a case of crediting one witness's testimony over another.  *See Anderson*, 470 U.S. at 575; *U.S. Gypsum Co.*, 333 U.S. at 396; *Cucuras*, 993 F.2d at 1528.

Dr. Martin wrote at the time that Merck knew there was no formal supply agreement in place and had decided not to go to the trouble and expense of putting one in place for the one-time sale.  (A1419.)  Merck had decided to pursue its first "important" sale of MTHF without a formal supply agreement.  (*Id.*)  Dr. Martin had directed the shipment to be sent with the customary safety and technical information, along with a legal disclaimer of liability for patent infringement and safety liability.  (A1421.)  It is clear error to credit testimony contradicted by the contemporaneous documents.  *See, e.g.*, *Anderson*, 470 U.S. at 575.

37

> **(iii)** **As a Matter of Law, the District Court's Deviation Despite its Lack of Findings and Cognizable Evidence Undermines the Uniformity and Certainty of the On-Sale Bar Which this Court Has Sought Since the *Group One* Case.**

Especially on this factual record, adopting the district court's rule would signal a slide back from the certainty of uniform contract law articulated in *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047–48 (Fed. Cir. 2011), to the amorphous and unpredictable "totality of the circumstances" test of *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1062 (Fed. Cir. 1989), which the Supreme Court swept away in *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998).

While a sharply divided panel of this Court did allow consideration of alleged industry custom on remand in *Lacks Industries Inc. v. McKechnia Vehicle Components USA, Inc.*, 322 F.3d 1335, 1348 (Fed. Cir. 2003), the purported offer was not made in response to a specific request; did not contain price, quantity, delivery and payment terms to a specific buyer; and did not respond to that buyer's request to specify a particular manner in which the sale should be executed.

Where, as here, a party argues that industry custom trumps the universally-acknowledged sufficiency of such terms, the danger of sliding back to the unpredictable and uncertain "totality of the circumstances test" is especially acute. As the dissent pointed out in *Lacks*, the law of Section 102(b) should be "consistent across industry boundaries as it is across state boundaries," and that

38

"Section 102(b) requires objective application of uniform contract law, not indulgence based on disputed local custom in the automobile tire wheel cladding business." *Id.* at 1352 (Newman, J. dissenting)

Further, the district court did not make any findings as to what constitutes "a potentially dangerous new drug," and likewise failed to make any factual findings as to why MTHF would qualify. (A0008–09.) Without a uniform scientific or legal standard for what defines such a "dangerous" drug, the scope of invalidity under Section 102(b) will vary from court to court and product to product.

> **(c)   The District Court Erred as a Matter of Law to Whatever Extent It Relied on Dr. Buchholz's Testimony as to under What Circumstances Merck Intended to Deliver the MTHF to Weider.**

Although it is unclear to which part of Dr. Buchholz's testimony the district court refers in its opinion, it was error to rely on any of his opinion testimony in 2015 regarding what circumstances back in 1998 he believes Merck would have been willing to deliver the MTHF to Weider. In particular, he opined that Merck never would have shipped the MTHF until purported patent issues had been resolved and unspecified toxicology (safety) testing complete. (A1292–93 at 735:11–736:7.)

First and foremost, such testimony is irrelevant as a matter of law. It is a bedrock principle of contract law "that the parties' objective expressed intent—not their secret, subjective intent—controls whether a bargain has been struck." *Linear*

39

*Tech.*, 275 F.3d at 1053.  Applying that principle, this Court in *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1370 (Fed. Cir. 2007), affirmed summary judgment of an invalidating offer to sell under Section 102(b).  The Court concluded that the patentee's "post hoc effort to say [that it] did not intend what is abundantly plain from the price, quantity, and delivery terms on the face of the June 7 letter does not raise a genuine issue of fact."  *Id.*

Second, the contemporaneous documents all showed that Weider reasonably expected delivery based on Merck's manifestation of intent to make its first sale of MTHF.  Merck committed to specially handling the order, even though it knew there was no supply agreement in place.  (A0008; A1421; A1386.)  Merck promised immediate delivery.  (A1386.)  Merck instructed Weider how to accept the order.  (A0008–09; A1452; A1455.)  Merck then instructed Weider how to expedite delivery.  (A1353.)

Throughout this period, there was no contrary communications from Merck according to the documents.  None of the detailed meeting minutes cited by Dr. Buchholz contain any indication that delivery would be delayed pending resolution of any of these contingencies.  (A1296 at 751:3–20; A1387.)  Dr. Buchholz himself admitted that none of the alleged deal breakers he testified about are reflected in the minutes of the December 15, 1998 meeting as reasons for the delay.  (A1296 at 750:13–751:20.)

40

Moreover, the contemporaneous documents specifically contradict Dr. Buchholz's claim that Merck would never have shipped the MTHF until all patent issues were resolved and further toxicology testing completed. Merck had already addressed toxicology and patent issues for the sale in Dr. Martin's memo of September 4, 1998. (A1421; A1448.) Dr. Martin had instructed Merck employees to include a notice "that with respect to patent infringement and toxicology the product will be used at Weider's risk." (A1421.) Indeed, Dr. Buchholz was one of Dr. Martin's colleagues to whom that directive was sent. (A1419; A1447.)

Even if Dr. Buchholz's testimony were not irrelevant as a matter of law, the district court's reliance on testimony contradicted by contemporaneous documents was clear error. Again, this is not a case in which the court assessed and accepted the credibility of one witness's testimony over another's. *See Anderson*, 470 U.S. at 575; *U.S. Gypsum Co.*, 333 U.S. at 396; *Cucuras*, 993 F.2d at 1528.

<div style="margin-left:2em;">

**(d)    The District Court Erred as a Matter of Law to Whatever Extent It Relied on Dr. Buchholz's Opinion Testimony as to What FDA Regulatory Hurdles Weider Might or Might Not Have Someday Needed to Address.**

</div>

Finally, the district court erred insofar as it relied on Dr. Buchholz's remaining opinion testimony of what data Weider might or might not someday need to develop a product containing MTHF, for which Weider supposedly would seek FDA approval to sell to the general public. For instance, he opined that "Weider could not use a compound in the food market, which is not safe, so that

41

was the major point there." (A1293 at 736:8–22.) He testified that he thought

Weider was far away from creating and marketing an FDA product containing

MTHF: "[I]t was not clear yet what application there were for [MTHF]. Where

would it go? What are the formulations? What is the marketing channel that will

be used for this?" (*Id.* at 739:5–15.)

Here again, Dr. Buchholz's speculation about what regulatory hurdles

Weider might or might not face is not evidence of industry recognition of essential

terms for the sale from Merck to Weider. To whatever extent Weider might

ultimately have chosen to seek FDA approval of a product containing this limited

supply of two kilograms of MTHF, it would be Weider's burden to establish the

safety and efficacy of MTHF, according to the standards of the FDA. The fact

remains that Weider wanted the MTHF, asked to buy it, followed Merck's

instructions, and was expecting it. Dr. Buchholz's musings about potential

regulatory hurdles based on possible future uses were simply not relevant to, and

cannot refute the existence of, Merck's commercial offer for sale.

### 4. Merck's Signed Written Offer Did Not Violate Section 5.2 of the Non-Disclosure Agreement.

The district court further erred in implicitly finding that Merck's

September 9, 1998 fax could not be a commercial offer because it failed the

requirements of Section 5.2. (A0012.) As the court explained, under Section 5.2

"a legally binding sale" had to be "reduced to writing and signed by both parties."

(*Id.*)  Therefore, an *offer* under Section 5.2, by the district court's own reasoning, had to be reduced to writing and signed by the offering party (such that it could be counter-signed to complete the legally binding sale).  Merck's fax was exactly that. (A1386.)

On its face, Merck's September 9, 1998 fax documented the definitive terms of the purchase, invited acceptance from Weider, and was clearly *signed* by Merck (Dr. Martin).  (A1386.)  All that was required to complete the sale, even under Section 5.2, was the offeree's counter-signature accepting the offer.  (*Id.*; *see also* A1371.)  That is the very definition of an offer.  *See Linear Tech.*, 275 F.3d at 1050 ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.") (quoting *Restatement (Second) of Contracts* § 24 (1981)).

Merck's signed fax was therefore a commercial offer that satisfied the signature requirement of Section 5.2.  While the fact of Weider's written acceptance is also compelling in view of the contemporaneous documents here, what occurred after Merck's offer simply does not matter.  Merck's signed written offer alone rendered claim 4 of its patent invalid under the on-sale bar, notwithstanding Section 5.2 of the non-disclosure agreement.

**C.     The District Court Erred in Finding That Merck Did Not Waive the Right to Insist on Strict Compliance with Section 5.2 of the Non-Disclosure Agreement.**

Section 5.2 of the non-disclosure agreement did not preclude a commercial offer or sale here for another, independent reason:  Merck waived its right to demand strict compliance with the formal requirements of Section 5.2, as a matter of law on the undisputed documentary evidence.

**1.     By Specifying the Procedure for Weider to Complete the Sale, Merck Waived Any Right to Claim That the Transaction Violated Section 5.2 of the Non-Disclosure Agreement.**

Merck waived its right to demand compliance with Section 5.2 by its own conduct.  A party cannot manifest an intent to forebear requiring strict compliance, and then, after the fact, demand that strict compliance for purposes of getting out of the contract.  Such conduct constitutes a waiver, as well as a breach of the duty of good faith.  *Lone Mountain Prod. Co. v. Natural Gas Pipeline Co. Am.*, 984 F.2d 1551, 1557 (10th Cir. 1992).

It is a fundamental rule of contract law that a party can waive its right to insist on strict compliance with a term by conduct inconsistent with an intent to require such compliance.[3]  Section 2-208(3) of the UCC provides that a party's

---

[3] The non-disclosure agreement contains a choice-of-law provision specifying Utah law.  (A1371.)  Nevertheless, Utah law appears to be consistent with the general contract law which controls the Court's analysis under *Group One*.

"course of performance shall be relevant to show a waiver . . . of any term inconsistent with such course of performance." U.C.C. § 208(3). Further, the U.C.C. provides that any attempt at modifying a contract—even one which requires modification to be written and signed by both parties—nevertheless "can operate as a waiver." U.C.C. § 209(4).

Federal courts around the country acknowledge and apply this black letter contract law. For instance, in *Dicon, Inc. v. Margen Corp.*, 618 F.2d 40 (8th Cir. 1980), the court held that the defendant had waived its right to insist on compliance with a provision requiring any claims for an extension of time to complete the project to be made within twenty days. The court found the defendant's conduct of accepting claims for delivery well after twenty days was "inconsistent with its contractual right to insist upon the twenty-day limit." *Id.* at 44. Similarly, the court in *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81 (D.D.C. 2004), held at summary judgment that the defendant had waived its right to insist on strict compliance with a requirement that plaintiff provide written notice of requests to draw funds under the agreement. The court found that defendant's failure to have objected to lack of written notice made it "beyond any genuine dispute that [its] actions constitute waiver." *Id.* at 89.[4]

---

[4] *See also*, *e.g.*, *Wis. Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280, 1284 (7th Cir. 1986), (waiver of the contract requirement that modification has to be written citing UCC § 2-209, based on acceptance of modified performance inconsistent

Here Merck evinced its intent not to seek strict enforcement of Section 5.2 in its response to Weider's request to handle the sale in the simplest way possible. (*See* A1446; A1386.)  Merck and Weider both knew at the time that there was no definitive supply agreement in place.  (*See* A1352; A1421.)  Merck also knew that it had no plans to put one in place.  (*Id.*)

Accordingly, to the extent that Merck's signed fax did not comply with Section 5.2, Merck acted (and even expressly invited Weider to act) in a way inconsistent with enforcing Section 5.2 when it agreed to Weider's request for a simplified process: "[W]e would like to handle your purchase of MTHF very simple.  Therefore please send the order to my attention and I will arrange everything."  (A1386.)  Merck further promised immediate delivery.  "If you need more, we have no problem for an immediately (*sic*) delivery."  (*Id.*)

Finally, even though it is not required, Weider's reliance on Merck's invitation to proceed without strict compliance to Section 5.2 is manifest in

---

with insisting on strict compliance); *Baiphore Ford Truck Sales, Inc.*, *v. Ford Motor Co.*, 380 F.3d 1331, 1338 (11th Cir. 2004) (party implicitly waived strict compliance with term specifying service of notice by failing to require service in that manner); *Little Beaver Enterprises v. Humphreys Railways, Inc.*, 719 F.2d 75, 79 (4th Cir. 1983) (party's failure to insist on strict compliance with written notice requirement waived party's right to assert non-written notice as a defense); *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 189–90 (2d Cir. 2014) (finding waiver of formal requirements recited in an indemnification clause because the party "tacitly encourag[ed]" the other to proceed in a manner inconsistent with the strict requirements of the clause, and because "no hint" was given that such requirements had to be satisfied before proceeding).

Weider's signed written responses and confirmed placement of the invited order. (*See* A1353–54; A1452; A1455.)

Merck's attempt now, more than fifteen years later, to disavow its own instructions and promised immediate delivery as violating Section 5.2 is the kind of breach of the duty of good faith that waiver is intended to prevent.

The facts constituting Merck's waiver in this case are the contemporaneous documents and their undisputed contents. "Where the facts are undisputed, a determination regarding waiver and estoppel is a question of law, reviewed *de novo*." *U.S. D.I.D. Corp. v. Windstream Comm'ns, Inc.*, 775 F.3d 128, 135 (2d Cir. 2014); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 59 (2d Cir. 2002); *Martin-Janson v. JP Morgan Chase Bank, N.A.*, 536 Fed. App'x 394, 397 (5th Cir. 2013) (A1529); *In re Metro. Intern., Inc.*, 616 F.2d 83, 86–87 (3d Cir. 1980); *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009); *Kennedy Miller Films PTY Ltd. v. Warner Bros., A Div. of Time Warner Entm't*, 199 F.3d 1332 (9th Cir. 1999). *See also B.R. Woodward Mktg, Inc. v. Collins Food Serv., Inc.*, 754 P.2d 99, 101 (Utah Ct. App. 1988) ("[I]t is perhaps more accurate to view the ultimate conclusion whether waiver has occurred, given particular facts, as a question of law.").

2. **The District Court Erred in Finding No Waiver Based on a Finding that the Parties Understood at the Time That a Signed Agreement Was Required.**

The district court erred in finding no waiver based on "testimony at trial" which purportedly "demonstrated that the parties understood that a signed agreement was necessary." (A0012.) Because the district court did not cite to or quote from the record or any case law of contractual waiver, it is difficult to say with certainty to what testimony it refers or the authority upon which it relies. (*See id.*)

The general contract law of waiver contemplates that the parties are aware of the contractual right waived—in this case, the right to insist upon a "definite agreement . . . signed by both parties" that is somehow different from the exchanged documents here. It is essential to waiver that the relinquished right be known to the party, in this case Merck. *See College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999); *Addicks Servs., Inc. v. GGP-Budgeland, LP*, 596 F.3d 286, 299 (5th Cir. 2010); *Zuckerman Spaeder, LLP v. Auffenberg*, 646 F.3d 919, 923 (D.C. Cir. 2011).

Accordingly, the Court's conclusion that "the parties understood that a signed agreement was necessary" under the terms of Section 5.3 supports rather than precludes waiver, as a matter of law.

### 3. The District Court Erred as a Matter of Law in Concluding That Waiver Would Defeat the Purpose of Section 5.2.

The district court committed legal error in concluding that finding waiver would defeat the purpose of Section 5.2. (A0012.) This is reflected in the court's failure to cite any contract waiver case law in support of its conclusion. Watson is not aware of any decision holding that the right to insist on a "definitive agreement . . . signed by both parties" cannot be waived.

If Merck had wished to safeguard against waiver of any right in the non-disclosure agreement, it could have included what is commonly known as a "non-waiver" clause. Merck was well acquainted with the necessity and function of such clauses. Indeed, Merck had inserted one into the draft joint development and supply agreement it had sent Weider before Weider pulled out of the joint development discussions. Section 16.6 of Merck's proposal provides: "Waiver. The failure of either party at any time or from time to time to exercise any of its rights or to enforce any of the terms, conditions or provision under this Agreement shall not be deemed to be a waiver of any such rights now shall it prevent such party from subsequently asserting or exercising any such rights." (A1384.) The parties' inclusion of a clause restricting modification of the non-disclosure agreement to signed agreements is not the same thing. (*See* A1371.) The UCC expressly provides that such clauses do not preclude waiver. *See* U.C.C. § 2-209(4).

49

In sum, the court's conclusion that waiver would defeat the purpose of Section 5.2 amounts to the truism that waiver of any contractual right is the loss of a right for which the waiving party had bargained to include a provision.

**4.      The District Court's Conclusion That the Contemporaneous Evidence Showed That Merck Viewed Weider's Acceptance as Merely an Expression of Interest is Legally Irrelevant and Factually Erroneous.**

The district court also erred in finding no waiver based on its conclusion that "contemporaneous evidence showed that Merck considered the discussions to be an indication of interest." (A0012.) As an initial matter, it is unclear what the court is referring to as "the discussions." Watson does not contend that there was an invalidating oral sale or offer for sale. Watson's case is based on the documents.

Assuming the court is referring to the exchange of Merck's faxes, Weider's email, and Weider's purchase order as "discussions," the court's conclusion is legally irrelevant to waiver, and clearly erroneous in light of the contemporaneous documents.

As a matter of contract law, any undisclosed subjective impression or intent is irrelevant. *Linear Tech.*, 275 F.3d at 1053. Waiver turns on the reasonable expectation of the other party in light of the first party's objective manifestation of an intent to forego strict compliance. Here, that manifestation was Merck's

response that the purchase could be made by simply sending Dr. Martin the purchase order. (*See* A1386.)

As a matter of fact, the documentary record reflects that Merck was moving quickly to prepare the order for shipment. Dr. Martin issued instructions even before Weider sent the confirmatory fax request, asking for the simplest way to handle the transaction. (A1419–21.) Dr. Martin's team prepared and sent the necessary factual, labeling and safety documents. (A1465.) Further, none of the minutes of any meetings between Weider and Merck reflect anything other than Merck's desire to make its first sale. Here again, the district court clearly erred in accepting Merck's testimony contradicted by the contemporaneous documents. The court did not credit one witness's testimony over another's, but rather credited testimony fifteen years after-the-fact over the contradictory contemporaneous documentary evidence. *See Anderson*, 470 U.S. at 575; *U.S. Gypsum Co.*, 333 U.S. at 396; *Cucuras*, 993 F.2d at 1528.

Merck was moving full-speed ahead, until the potential exclusive deal with Weider's competitor came on the horizon. Thereafter, Merck wished it had moved slower, and that it did not have an unfilled order on its hands that could jeopardize a much bigger deal. It was only after this point that the record reflects Merck trying to put off or delay the delivery. (*See* A1398.) But by this time, the offer for sale had already been made and accepted. The record at the time of the offer and

acceptance in no way reflects that Merck treated Weider's purchase order as a mere expression of interest or invitation to negotiate.

**D.    The Asserted Claim is Invalid under Section 102(b) Because the Claimed Invention Was Also the Subject of a Commercial Sale by Merck to Weider in September 1998.**

Although Merck's commercial offer alone was invalidating, the reality here was that Merck and Weider also entered into an invalidating sale.  Weider accepted Merck's offer in its email of September 16, 1998 (A1352), agreeing to be bound by the terms in Dr. Martin's September 9, 1998 faxed offer (A1386); and if not then, surely when it submitted the purchase order invited by Dr. Martin's fax (A0009; A1452).  That documented sale was not barred by the non-disclosure agreement from their earlier proposed joint venture.

"A 'sale' under th[e on-sale] bar occurs when the parties offer or agree to reach 'a contract . . . to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'"  *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353, 1355 (Fed. Cir. 2001) (quoting *Zacharin v. United States*, 213 F.3d 1366, 1370 (Fed. Cir. 2000)); *In re Cygnus Telecomm'ns Tech., LLC, Patent Litig.*, 481 F. Supp. 2d 1029, 1052 (N.D. Cal. 2007), *aff'd*, 536 F.3d 1343 (Fed. Cir. 2008).

A sale within this meaning of the on-sale bar occurred on September 16, 1998, when Weider accepted Merck's terms in an email.  (A1386; A1352.)  Dr.

Martin had set forth all material terms of the purchase, including product, quantity, price, delivery and payment terms.  (A1386.)  Weider accepted and promised to pay for the MTHF when Mr. Jepson wrote: "I have been given a copy of your fax, dated 9-09-98 covering the price and terms.  We will order 2 KG of the material against PO# 29337 for delivery to" the Weider facility proposed in Dr. Martin's fax.  (A1352.)

Plainly, at that time Merck and Weider had either reached or "agree[d] to reach 'a contract … to give and pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'"  *Special Devices*, 270 F.3d at 1355.  If there were any doubt as to the latest possible precise date of the sale, it can also be said to have occurred by September 28, 1998, when Weider emailed Merck, promising to follow the expediting procedure provided in Dr. Martin's fax of September 25, 1998.  (A1452.)  And, finally, there plainly was a sale by the time Weider actually placed its order, confirmed by Merck on October 8, 1998.  (A1455.)  The fact that Weider subsequently canceled its order in January 1999 does not undo the fact of the sale back in 1998.  (*See* A1463.)

Moreover, the exchanged signed purchase documents constituted "such definitive agreement . . . signed by both parties" under Section 5.2 of the non-disclosure agreement.  (*See* A1371.)  The terms were well-defined and agreed

upon, and the writings satisfied the provision's signature requirement.  That is all that was needed.

The district court implicitly construed the term "such definitive agreement" in Section 5.2 to exclude the signed offer and acceptance documents exchanged by the parties for the stand-alone sale.  (A0012 ("I agree with Merck that the discussions in the fall of 1998 would not constitute a legally binding sale until reduced to writing and signed by both parties.")  The court did not, however, say what it concluded "such definitive agreement" means, or how it reached that conclusion.  (*See id.*)

As a matter of general contract law and the law of Utah, the term "such definitive agreement" is ambiguous.  It is not defined in the non-disclosure agreement.  The modifier "*such*" plainly refers to a particular "definitive agreement" described elsewhere.  However, "definitive agreement" does not appear anywhere elsewhere in the non-disclosure agreement.  (*See* 1368–73.)  *See Memdata, LLC v. Intermountain Health Care*, No. 2:08-CV-190 TS, 2010 WL 1529275, at *3 (D. Utah Apr. 15, 2010) (term is facially ambiguous due to "no definition or guidance" in contract as to its meaning) (A1535); *In re Steele*, 996 F.2d 311, at *6 (10th Cir. 1993) (unpublished) (facial ambiguity where "no indication in the agreement how 'or otherwise' language is to be interpreted") (A1512).

Courts look to extrinsic evidence to determine whether a term is ambiguous. *Watkins v. Ford*, 239 P.3d 526 (Utah Ct. App. 2010), *aff'd*, 304 P.3d 841, as amended, (Utah 2013); *Daines v. Vincent*, 190 P.3d 1269 (Utah 2008); *In re New Valley Corp.*, 89 F.3d 143, 150 (3d Cir. 1996) (citing *Restatement (Second) of Contracts* § 223 cmt b (1981)); *see also* U.C.C. § 2-202(a).  Moreover, evidence of the parties' subsequent conduct, prior to any dispute, is strong evidence of facial ambiguity.  *Keybank Nat'l Ass'n v. Sys. W. Computer Res.*, 265 P.3d 107, 112 (Utah Ct. App. 2011); *In re New Valley Corp.*, 89 F.3d at 150; *Upland Indus. Corp. v. Pac. Gamble Robinson Co.*, 684 P.2d 638, 642 (Utah 1984) ("A construction given [to a contractual provision] by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will when reasonable, be adopted and enforced by the court.") (citations omitted); *McNeil Eng'g & Land Surveying v. Bennett*, 268 P.3d 854, 860 (Utah Ct. App. 2011); *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 509 (3d Cir. 2005).

The conduct of the parties here reflected their mutual understanding that the written communications completing the sale (signed, exchanged faxes and emails) satisfied the requirements of Section 5.2 with respect to the stand-alone sale in the circumstances.  Merck was aware that there was no broader supply agreement in place, and did not intend to put one in place.  As Dr. Martin wrote his colleagues,

"No supply agreement whatsoever exists with Weider for L-5-MTHF, and the conclusion of such an agreement is no longer planned at this time." (A1421.)

Merck assured Weider that it "will arrange everything" for the purchase, and provided instructions for obtaining immediate delivery. (A1386.) Dr. Bucci testified that Weider was expecting delivery of the MTHF. (A1082 at 226:3–7.) There is no evidence that Weider had that expectation for any reason other than that it had accepted Dr. Martin's offer, had placed an order, and had received confirmation that the order had been placed. The contemporaneous record is wholly devoid of any indication that the parties contemplated the need for a further or additional written agreement.

Finally, the exchange of signed faxes and emails satisfied Section 5.2's requirement that the agreement be "signed by both parties." By 1998, multiple jurisdictions held that emails satisfied the signature requirement of Statute of Frauds. *See, e.g.*, *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1362 (Fed. Cir. 2005); *Lehman Bros. Inc. v. Can. Imperial Bank of Commerce*, No. 97-8226, 2000 WL 1425098, at *14 (S.D.N.Y. Sept. 27, 2000) (A1524). Further, under the Federal Circuit's holding in *Lamle*, emails would have satisfied the statute of frauds in Utah insofar as Utah had recognized typewritten telegraphs as sufficient. *See Williams v. Singleton*, 723 P.2d 421, 423–24 (Utah 1986). Also, it is well-settled that an executed agreement need not be a single sheet of paper, but may consist of

56

the exchange of signed communications. *See, e.g.*, *Wilson v. Johnson*, 234 P.3d 1156, 1162 (Utah Ct. App. 2010); *Goss v. ABN Amro Mortgage Group*, 549 Fed. App'x 466, 472 (6th Cir. 2013) (A1502–03). Accordingly, the district court erred in concluding that Section 5.2 of the non-disclosure agreement precluded the documented reality of a commercial offer and sale here.

## CONCLUSION

This Court should reverse the district court's erroneous conclusion of no commercial sale or offer for sale.

Respectfully submitted,

**MADDOX EDWARDS, PLLC**

Dated: October 20, 2015    By: */s/ Steven A. Maddox*
STEVEN A. MADDOX
   *Counsel of Record*

*Attorney for Defendant-Appellant*
Watson Laboratories, Inc.

**ADDENDUM**

**Page No.**

Final Judgment
  (1:13-cv-00978-RGA, D.E. 117), dated 09/14/2015..............................A0001

Final Judgment
  (1:13-cv-01272-RGA, D.E. 116), dated 09/14/2015..............................A0003

Trial Opinion
  (1:13-cv-00978-RGA, D.E. 115), dated 08/31/2015..............................A0005

U.S. Patent No. 6,441,168.................................................................................A0022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MERCK & CIE, BAYER PHARMA AG and BAYER HEALTHCARE PHARMACEUTICALS INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 13-978 (RGA) ) |
| WATSON LABORATORIES, INC., | ) ) |
| Defendant. | ) |

## [PROPOSED] FINAL JUDGMENT

This action, having come to trial before the Court from May 18 through May 21, 2015, Honorable Richard G. Andrews, District Judge presiding, the evidence and testimony of witnesses of each side having been heard and a decision having been rendered:

**IT IS HEREBY ORDERED AND ADJUDGED** this $14$ day of September, 2015, for the reasons set forth in the Order Regarding Infringement and Claim Construction of U.S. Patent No. 6,441,168 dated February 19, 2014 (D.I. 38) and the Court's Trial Opinion dated August 31, 2015 (D.I. 115) that:

1.  Judgment is entered in favor of Plaintiffs Merck & Cie, Bayer Pharma AG and Bayer HealthCare Pharmaceuticals Inc. (collectively "Plaintiffs") and against Defendant Watson Laboratories, Inc. ("Watson") on the claim in Plaintiffs' Complaint for Patent Infringement dated June 4, 2013 (D.I. 1), that the commercial manufacture, use, offer for sale, sale, and/or importation into the United States of the proposed generic version of Bayer HealthCare's Safyral® combined oral contraceptive that is the subject of Watson's Abbreviated New Drug Application ("ANDA") No. 203594 would infringe Claim 4 of U.S. Patent No. 6,441,168 ("the '168 patent").

2. Judgment is entered in favor of Plaintiffs and against Watson on the counterclaim of invalidity in Watson's Answer to Complaint, Defenses, and Counterclaims dated August 2, 2013 (D.I. 11). Specifically, that Claim 4 of the '168 patent is not invalid for having been on sale in this country, more than one year prior to the date of application for the patent under 35 U.S.C. § 102(b), not invalid as anticipated under 35 U.S.C. § 102, not invalid for obviousness under 35 U.S.C. § 103, and not invalid for lack of written description under 35 U.S.C. § 112.

3. Pursuant to 35 U.S.C. § 271(e)(4)(A), the Food and Drug Administration ("FDA") is ordered to make the effective date of any final approval of Watson's ANDA No. 203594 to be a date that is not earlier than the date of expiration of the '168 patent (April 17, 2020).

4. Pursuant to 35 U.S.C. § 271(e)(4)(B), Watson and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise, are hereby permanently enjoined from manufacturing, using, offering to sell, or selling within the United States, or importing into the United States, Watson's proposed generic version of Bayer HealthCare's Safyral® combined oral contraceptive that is the subject of Watson's ANDA No. 203594 during the term of the '168 patent.

_Sept 14, 2015_
DATED

_Richard G. Andrews_
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MERCK & CIE, BAYER PHARMA AG and BAYER HEALTHCARE PHARMACEUTICALS INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 13-1272 (RGA) ) |
| WATSON LABORATORIES, INC., | ) ) |
| Defendant. | ) |

## [PROPOSED] FINAL JUDGMENT

This action, having come to trial before the Court from May 18 through May 21, 2015, Honorable Richard G. Andrews, District Judge presiding, the evidence and testimony of witnesses of each side having been heard and a decision having been rendered:

**IT IS HEREBY ORDERED AND ADJUDGED** this *14* day of September, 2015, for the reasons set forth in the Order Regarding Infringement and Claim Construction of U.S. Patent No. 6,441,168 dated February 19, 2014 (D.I. 38) and the Court's Trial Opinion dated August 31, 2015 (D.I. 114) that:

1.     Judgment is entered in favor of Plaintiffs Merck & Cie, Bayer Pharma AG and Bayer HealthCare Pharmaceuticals Inc. (collectively "Plaintiffs") and against Defendant Watson Laboratories, Inc. ("Watson") on the claim in Plaintiffs' Complaint for Patent Infringement dated July 23, 2013 (D.I. 1), that the commercial manufacture, use, offer for sale, sale, and/or importation into the United States of the proposed generic version of Bayer HealthCare's Beyaz® combined oral contraceptive that is the subject of Watson's Abbreviated New Drug Application ("ANDA") No. 203593 would infringe Claim 4 of U.S. Patent No. 6,441,168 ("the '168 patent").

2.      Judgment is entered in favor of Plaintiffs and against Watson on the counterclaim of invalidity in Watson's Answer to Complaint, Defenses, and Counterclaims dated August 19, 2013 (D.I. 11).  Specifically, that Claim 4 of the '168 patent is not invalid for having been on sale in this country, more than one year prior to the date of application for the patent under 35 U.S.C. § 102(b), not invalid as anticipated under 35 U.S.C. § 102, not invalid for obviousness under 35 U.S.C. § 103, and not invalid for lack of written description under 35 U.S.C. § 112.

3.      Pursuant to 35 U.S.C. § 271(e)(4)(A), the Food and Drug Administration ("FDA") is ordered to make the effective date of any final approval of Watson's ANDA No. 203593 to be a date that is not earlier than the date of expiration of the '168 patent inclusive of the patent term extension awarded to Plaintiffs under 35 U.S.C. § 156 (July 30, 2022).

4.      Pursuant to 35 U.S.C. § 271(e)(4)(B), Watson and its officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise, are hereby permanently enjoined from manufacturing, using, offering to sell, or selling within the United States, or importing into the United States, Watson's proposed generic version of Bayer HealthCare's Beyaz® combined oral contraceptive that is the subject of Watson's ANDA No. 203593 during the term of the '168 patent.

Sept 14, 2015
_____
DATED

_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MERCK & CIE, BAYER PHARMA AG and
BAYER HEALTHCARE
PHARMACEUTICALS INC.,

                Plaintiffs;

    v.

WATSON LABORATORIES, INC.,

                Defendant.

Civil Action No. 13-978-RGA
Civil Action No. 13-1272-RGA

TRIAL OPINION

Jack B. Blumenfeld, Esq., Rodger D. Smith II, Esq., Derek J. Fahnestock, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Adam K. Mortara, Esq., J. Scott McBride, Esq., Rebecca T. Horwitz, Esq., Faye E. Paul, Esq., Bartlit Beck Herman Palenchar & Scott LLP, Chicago, IL, attorneys for Plaintiffs.

Richard L. Horwitz, Esq., David E. Moore, Esq., Bindu A. Palapura, Esq., Stephanie E. O'Byrne, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Steven A. Maddox, Esq., Jeremy E. Edwards, Esq., Matthew C. Ruedy, Esq., Maddox Edwards PLLC, Washington, D.C., attorneys for Defendant.

August _31_, 2015

ANDREWS, U.S. DISTRICT JUDGE:

Merck & Cie, Bayer Pharma AG, and Bayer HealthCare Pharmaceuticals Inc. (collectively, "Merck" or "Plaintiff") brought this suit against Watson Laboratories, Inc. ("Watson" or "Defendant") alleging infringement of U.S. Patent No. 6,441,168 ("the '168 patent"). (D.I. 1). Watson filed two Abbreviated New Drug Applications ("ANDAs") seeking approval to engage in the commercial manufacture, importation, use, or sale of generic versions of Safyral® and Beyaz®. This action centers on one ingredient of the proposed drugs: the Type I crystal form of calcium 5-methyl-(6S)-tetrahydrofolate ("MTHF"). (Tr. 2025:8-10).[1]

Claim 4 of the patent recites: "A crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.5, 13.3, 16.8, and 20.1 (Type I) said crystalline salt having a water of crystallization of at least one equivalent per equivalent of 5-methyltetrahydrofolic acid." ('168 patent, col. 10, ll. 57-61). The powder x-ray diffraction diagram in the specification shows peaks at the two theta values described in the claim:



---

[1] Citations to "Tr." refer to the transcript of the bench trial held on May 18, 2015 through May 21, 2015. Page numbers reflect the "PageID."

1

The specification also states that the solubility of the Type I crystal is 1.1%, which meets the United States Pharmacopeia ("USP") definition of "sparingly soluble." ('168 patent, col. 4, l. 58; PTX195 at p. 6). The water content of the Type I crystal is 14.5%. ('168 patent, col. 5, l. 67).

The parties stipulated that, if claim 4 of the '168 patent is valid and enforceable, (1) Defendant's filing of ANDA Nos. 203593 and 203594 would constitute an act of infringement and (2) commercial manufacture, use, offer for sale, sale, and/or importation of Defendant's Safyral® ANDA Product and/or Beyaz® ANDA Product would infringe the claim. (D.I. 38). Watson asserts that claim 4 is not valid and enforceable. It contends that the asserted claim is invalid under the on-sale bar of 35 U.S.C. § 102(b), anticipated under 35 U.S.C. § 102(a), obvious under 35 U.S.C. § 103(a), and invalid under 35 U.S.C. § 112 for lack of written description. (D.I. 108 at p. 1).

## I.     ON-SALE BAR

## A.     Legal Standard

A patent claim is invalid under the on-sale bar of 35 U.S.C. § 102(b) if "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States." The on-sale bar requires proof of two conditions: (i) the product is "ready for patenting," and (ii) the invention is "the subject of a commercial offer for sale." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 66-68 (1998); *Medicines Co. v. Hospira, Inc.*, 791 F.3d 1368, 1370 (Fed. Cir. 2015). "An actual sale is not required for the activity to be an invalidating commercial offer for sale. An attempt to sell is sufficient so long as it is sufficiently definite that another party could make a binding contract by simple acceptance." *Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*, 726 F.3d 1370, 1374-75 (Fed. Cir. 2013) (internal

2

citations omitted).   "[T]he question of whether an invention is the subject of a commercial offer for sale is a matter of Federal Circuit law, to be analyzed under the law of contracts as generally understood."  *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047 (Fed. Cir. 2001).

**B.    Findings of Fact**

1.  The application for the '168 patent was filed on April 17, 2000.

2.  The '168 patent issued on August 27, 2002.

3.  The '168 patent was ready for patenting by September 1998.

4.  In 1997, Merck and Weider Nutrition International ("Weider") were exploring a strategic partnership to introduce dietary supplements with Merck ingredients into the United States.

5.  On February 25, 1998, Merck and Weider entered into a Confidentiality and Noncompetition Agreement ("CDA").   Section 5.2 of the CDA provided, "Unless and until such definitive agreement regarding a transaction between Weider and Merck has been signed by both parties, neither party will be under any legal obligation of any kind with respect to such a transaction."

6.  In August 1998, Weider notified Merck that it was no longer interested in an exclusive strategic partnership.

7.  In August 1998, Weider inquired about a stand-alone purchase of two kilograms of MTHF.

8.  Weider and Merck exchanged communications about the purchase throughout the fall of 1998.

9.  On September 9, 1998, Roland Martin of Merck sent a fax to Weider with terms for the purchase, including price, quantity, delivery, and payment.

3

10. On September 16, 1998, Weider responded, confirming the delivery address and indicating that it would send a purchase order after receiving additional information required to add Merck as a supplier.

11. Weider did not receive the MTHF, and cancelled the purchase on January 9, 1999.

## C.    Conclusions of Law

In order to show that an invention was ready for patenting, there must be proof of a reduction to practice before the critical date or proof that the inventor prepared enabling drawings or descriptions of the invention. *Pfaff*, 525 U.S. at 67-68. Merck wrote to Weider on September 25, 1998 and stated that the MTHF to be delivered would be from Lot ESF-118. (DTX 27 at p. 2). Merck stipulated that (1) Lot ESF-118 is within the scope of claim 4 of the '168 patent, (2) the x-ray diffraction pattern of Lot ESF-118 is disclosed in Figure 1 of the patent, and (3) the x-ray diffraction pattern of Lot ESF-118 was obtained by Merck at least as of August 25, 1998. (D.I. 73 at 2). The MTHF was therefore ready for patenting by September 1998.

Watson argues that the September 9, 1998 and September 16, 1998 communications constitute a commercial sale. (Tr. 2800; D.I. 108 at p. 8). Watson contends that the September 9, 1998 fax contained all the material terms necessary for an offer to be sufficiently definite: a description of the product, quantity, price, delivery information, and payment terms. (D.I. 108 at p. 11). Watson argues that Weider understood at the time that a sale had occurred. (*Id.* at p. 11). It notes that Dr. Bucci of Weider testified that he was expecting Merck to deliver the MTHF. (Tr. 2240 at 3-7). Even if a sale did not occur for the purposes of the on-sale bar, Watson maintains that the September 9, 1998 fax constituted a commercial offer for sale. (D.I. 108 at p. 7).

4

Watson also argues that § 5.2 of the CDA did not operate to prevent a commercial sale. (*Id.* at p. 12). Watson maintains that a "transaction" for the purposes of the agreement does not include a stand-alone purchase, but rather refers to the larger joint venture the companies were exploring. (*Id.* at p. 14). In addition, Watson argues that the September correspondence was a "definitive agreement." (*Id.*). Watson further argues that, even if the CDA did apply to the stand-alone purchase, Merck waived § 5.2 by inviting Weider to follow a process for sale that did not comply with § 5.2. (*Id.*).

Finally, Watson argues that there were no remaining terms or conditions that needed to be determined before a sale could occur. (*Id.* at p. 17). Watson argues that Dr. Bucci expected delivery and Merck promised to "arrange everything" for "immediate delivery," both of which contradict Merck's contention that there were outstanding conditions. (*Id.* at pp. 17-18; DTX 133).

Merck maintains that, in light of § 5.2 of the CDA, there was no commercial sale or offer for sale. (D.I. 111 at p. 4). The CDA provides that a transaction is not legally binding until there is a definitive agreement signed by both parties. (*Id.*). Merck argues that there was no such signed agreement, and thus there cannot be a legally binding sale. (*Id.*). Merck notes that both Dr. Buchholz of Merck and Dr. Bucci of Weider testified that there was no obligation to deliver a product absent a formal written agreement. (*Id.* at p. 5). Dr. Buchholz testified, "The conversations and discussions we had did not create any obligation to Weider or from Weider to us unless we afterwards, after we had the discussion, signed a formal agreement and contract." (Tr. 2749:8-12). Dr. Bucci testified that it was his "understanding that until [they] had a signed agreement, it was all discussions." (*Id.* at 2227:6-8).

5

Merck argues that a "transaction" for the purposes of the CDA includes a stand-alone purchase, and is not limited to a long-term strategic partnership.  (D.I. 111 at p. 13).   Merck notes that in the September 1998 correspondence, the order was referred to as a "transaction." (*Id.*).   Merck also argues that no document in the fall 1998 correspondence is signed by both parties.  (*Id.* at p. 14).   With respect to waiver, Merck contends that Watson's argument is circular because it would mean that the circumstances § 5.2 is designed to protect against would operate to waive it.  (*Id.* at p. 15).

Merck further argues that a sale was not possible in the fall of 1998 because there were outstanding issues that needed to be resolved before a sale could occur.  (D.I. 111 at p. 7). Merck contends that there could be no sale until toxicology tests were performed, intellectual property and regulatory matters were resolved, and liability apportionment was determined.  (*Id.* at p. 8).  Dr. Buchholz testified that it was industry standard to include safety information, liability apportionment, and intellectual property rights in a sale agreement.  (Tr. 2750:19-2751:17).   Merck argues that industry practice is a relevant consideration to determining whether there has been an offer for sale.  (D.I. 111 at p. 8 (citing *Lacks Indus., Inc. v. McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1348 (Fed. Cir. 2003))).

Merck further argues that contemporaneous documentary evidence confirms that neither Weider nor Merck believed that there was a binding sale or offer at the time.  (*Id.*).   On January 6, 1999, there was an internal Weider email exchange regarding MTHF.   A Weider employee wrote, "we had indicated an interest for 2Kg" of MTHF and asked for clarification on the order status.  (PTX094).   Preston Zoller forwarded the email to Dr. Bucci and another Weider employee.   He noted that "Merck wasn't expecting us to buy any immediately" and "there wouldn't be any dire consequences to cancelling the P.O., (if one exists) until such time as a new

6

5-MTHF product is actually approved for launch." (*Id.*). Merck argues that this exchange is consistent with there being no contract in place. (D.I. 111 at p. 9). Merck contends it also shows that Weider believed regulatory approval was required before there could be a launch, which demonstrates that there were outstanding issues to resolve. (*Id.*).

A commercial "offer must be sufficiently definite that another party could make a binding contract by simple acceptance." *Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed. Cir. 2008). "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent." RESTATEMENT (SECOND) OF CONTRACTS § 26 (1981). It is undisputed that the CDA remained in effect at least through January 1999. (Tr. 2817:10-16). I agree with Merck that the discussions in the fall of 1998 would not constitute a legally binding sale until reduced to writing and signed by both parties. Because a further manifestation of assent was required, the correspondence was also not an offer that could be made binding upon acceptance.

I do not think that Merck waived § 5.2. As Merck noted, if its conduct were sufficient to waive § 5.2, that section would serve no purpose. The testimony at trial demonstrated that the parties understood that a signed agreement was necessary. In addition, contemporaneous evidence showed that Merck considered the discussions to be an indication of interest.

I also think that industry-standard terms were missing from the communications. It seems to me that determining liability apportionment for a potentially dangerous new drug would be very important to a sale. While an offer can sometimes be sufficiently definite with only the terms present in the September communications, which terms are necessary should be considered in light of the product. I do not think that the communications were sufficiently definite to

7

constitute an offer given that important safety and liability terms, which Dr. Buchholtz testified were standard in the industry, were missing.

In sum, there was not a commercial offer or sale of MTHF that would invalidate the '168 patent under the on-sale bar.

## II. ANTICIPATION

### A. Legal Standard

"To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." *Silicon Graphics, Inc. v. ATI Tech., Inc.*, 607 F.3d 784, 796 (Fed. Cir. 2010). "[E]very element of the claimed invention [must be described], either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009). "Inherent anticipation requires that the missing descriptive material is necessarily present, not merely probably or possibly present, in the prior art." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002). As with infringement, the court construes the claims and compares them against the prior art. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010).

### B. Findings of Fact

1. Different crystal structures of the same chemical entity are polymorphs.

2. A hydrate is a crystalline solid where water is a part of the structure.

3. The Type I crystal is the only currently known pentahydrate polymorph of MTHF.

4. Powder x-ray diffraction ("PXRD") is a method of determining whether a substance has a crystalline content.

8

5. PXRDs of crystalline substances have features, or peaks, at given two theta values.

6. PXRDs of amorphous substances show less defined, broader humps.

7. Dr. Marsden's and Dr. Rogers's experiments did not follow the procedure in U.S. Patent No. 5,350,850 ("the '850 patent").

## C.   Conclusions of Law

Watson argues that claim 4 of the '168 patent is anticipated by the '850 patent. (D.I. 108 at p. 18). Watson maintains that Example 3 of the '850 patent details a method of obtaining a crystalline pentahydrate of MTHF ("the '850 product"). (*Id.*). Watson argues that the Patent and Trademark Office examiner found that the '850 product was a pentahydrate of MTHF. (DTX 001 at pp. 216-17). Specifically, the examiner found that the '850 product had a moisture content of 15.27%, which corresponds to a pentahydrate. (*Id.*). Watson argues that Type I crystals are the only known crystalline pentahydrate of MTHF. (*Id.*). Watson's expert, Dr. Rogers, testified that it was "highly unlikely" that there is an undiscovered polymorph of MTHF. (Tr. 2428:14-18).

Watson further argues that the two theta values recited in claim 4 are inherently present in the '850 product. (D.I. 108 at p. 19). Watson notes that Dr. Rogers received a sample of MTHF from Dr. Marsden (Material 1), confirmed it was amorphous using PXRD, and performed the recrystallization process taught by the '850 patent. (*Id.* at p. 25). Dr. Rogers tested the resulting products (Materials 2 and 3) and found that they exhibited all four two theta values recited in claim 4. (*Id.*).

Merck argues that the '850 product is not a Type I crystal. (D.I. 111 at p. 17). Merck maintains that the '850 product is "practically insoluble," whereas the Type I crystal is "sparingly soluble." (*Id.*). "Practically insoluble" and "sparingly soluble" are terms of art understood by

9

persons of ordinary skill. (*Id.* at 20). The USP defines "practically insoluble" as less than 0.001% solubility. (PTX195 at p. 6). The USP defines "sparingly soluble" as approximately 1% solubility. (*Id.*). Merck argues that the '850 product cannot be the Type I crystal because the Type I crystal is one hundred times more soluble than the '850 product. (D.I. 111 at p. 20).

Merck further argues that it is possible that there are undiscovered polymorphs of MTHF. Watson therefore cannot prove that the '850 product is the claimed invention based solely on the fact that it is a pentahydrate of MTHF. (*Id.* at p. 21). Merck contends that the company Merck hired to look for new MTHF polymorphs noted that further testing "may reveal other unknown modifications with varying water contents." (*Id.* at p. 22 (quoting DTX302 at 25)). It notes that new polymorphs are often discovered years after a substance has been in use. (*Id.*).

In addition, Merck maintains that Watson cannot show that following the '850 procedure results in a product with the two theta values recited in claim 4 because Watson's experts did not follow the '850 process. (*Id.* at p. 23). Dr. Marsden prepared Material 1 using a different process than the '850 process. Dr. Rogers therefore recrystallized a different material than that produced by the '850 process. Merck argues that a prior art process can only inherently anticipate if the claimed invention inevitably occurs when the prior art procedure is "faithfully followed." (*Id.* at p. 24 (quoting *Valeant Int'l (Barbados) SRL v. Watson Pharm., Inc.*, 2011 WL 6792653, at *5 (S.D. Fla. Nov. 8, 2011), *aff'd sub nom. Valeant Int'l Bermuda v. Actavis, Inc.*, 534 F. App'x 999 (Fed. Cir. 2013))). Because Dr. Rogers and Dr. Marsden did not follow the procedure, Merck argues that Dr. Rogers's experiment is not probative of what the '850 procedure would inevitably produce. (*Id.*).

Merck further argues that, even if Dr. Rogers's experiment were relevant, its results would be invalid because Material 1 was seeded with Type I crystals. (*Id.* at p. 26). Seeding is

10

adding a small amount of a crystal form to a sample to facilitate the formation of that type of crystal.  (*Id.*).   Merck notes that seeding does not need to be intentional, and can occur through inadvertent contamination.  (*Id.*).   Merck argues that Dr. Myerson's PXRD testing found that Material 1 was seeded with Type I crystals.  (*Id.*).   Dr. Myerson's PXRD of Material 1 showed a large, defined peak at 6.5.  (*Id.*).   Merck argues that the peak at 6.5 is the characteristic peak of Type I crystals.  (*Id.*).   Dr. Myerson's PXRD (PTX167) is below:



I find that the '850 patent does not anticipate claim 4.   The '850 product and the Type I crystal have different solubilities, which is not consistent with them being the same product.   In addition, I think Dr. Rogers's experiment fails to show inherent anticipation.   As shown above, the PXRD has a distinct feature at 6.5.   I think that Dr. Myerson's testimony that the peak demonstrates that Material 1 was seeded with a crystalline substance was credible.[2]   Dr.

---

[2] I do not mean to imply that Watson purposefully attempted to manipulate the experiment.   Seeding can occur inadvertently.

11

Myerson noted that those of skill in the art look for the biggest characteristic peak when searching for a substance in a mixed sample. (*Id.* at 1222:18-22). Dr. Rogers agreed that, when a sample has impurities, not all peaks will be visible. (Tr. 2453:4-10). Therefore, the fact that only the 6.5 peak is visible does not mean that Type I crystal was not present in Material 1. Dr. Rogers explained the peak by arguing that calcium salts of long molecules often have a peak at a low two theta value. (Tr. 2273:6-8). This argument, however, is unsupported by the evidence.

I also agree with Merck that an experiment that did not follow the '850 procedure is not probative of what would inevitably occur if the '850 procedure were followed. This Court has previously held that experiments that do not follow the prior art procedure alleged to inherently anticipate cannot show inherent anticipation. *In re Armodafinil Patent Litig. Inc. (%2C722 Patent Litig.)*, 939 F. Supp. 2d 456, 478-79 (D. Del. Mar. 30, 2013).

## III. OBVIOUSNESS[3]

### A. Legal Standard

A patent claim is invalid as obvious under 35 U.S.C. § 103 "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103; *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-07 (2007).

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill

---

[3] Though Watson did not technically waive its obviousness and written description arguments, its post-trial briefing suggests that it gives little weight to those defenses. (*See* D.I. 108 (fewer than two pages for each argument), D.I. 105 (no obviousness argument and fewer than two pages on written description)).

in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." *KSR*, 550 U.S. at 406 (internal citation omitted).

A court is required to consider secondary considerations, or objective indicia of nonobviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended–Release Capsule Patent Litig.*, 676 F.3d 1063, 1078-79 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

**B.    Findings of Fact**

1.   The level of ordinary skill in the art is either (1) a person with a bachelor's degree in chemistry, chemical engineering, or a related field and at least three years of experience in the pharmaceutical industry doing crystallization or other tasks involving solid state form or (2) a person with an advanced degree in chemistry, chemical engineering, or a related field.

2.   Different polymorphs of a substance have different chemical properties.

3.   Crystalline calcium MTHF was a desired product with known therapeutic benefits.

4.   There was motivation in the industry to find and characterize new crystalline polymorphs of MTHF.

5.   Discovering an unknown polymorph is a process of trial and error.

6.   Dr. Rogers testified that there was no evidence of industry acclaim with respect to the invention.

**C.    Conclusions of Law**

13

Watson argues that claim 4 is obvious in light of the '850 patent alone or in combination with U.S. Patent No. 5,006,655 ("the '655 patent"). (D.I. 108 at p. 28). The '655 patent discloses the pentahydrate calcium MTHF. (Tr. 2834:3-6). Watson argues that a person of skill in the art would have a reasonable expectation of producing Type I crystals by combining the pentahydrate calcium MTHF with the recrystallization process taught in the '850 patent. (D.I. 108 at p. 28). Watson maintains that crystalline MTHF was known and preferred, and there was motivation in the industry to find and characterize crystalline forms. (*Id.*).

Merck argues that there was not a reasonable expectation of success of producing Type I crystals because discovering an unknown polymorph is a process of trial and error. (D.I. 111 at p. 28). Merck maintains that there cannot be a reasonable expectation of success where a process is "complicated, unpredictable, and largely conducted through trial and error." (*Id.* (quoting *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 555 F. App'x 961, 971 (Fed. Cir. 2014))). Both Dr. Rogers and Dr. Myerson testified that finding an unknown polymorph is an unpredictable process of trial and error. (Tr. 2478:18-21, 2629:17-2630:7).

There was no post-trial briefing with respect to secondary considerations, and minimal testimony. I find that no secondary considerations have been proven.

Watson has not demonstrated that a person of skill in the art would have a reasonable expectation of success of producing Type I crystals in light of the prior art. For the reasons discussed above, the '850 patent does not anticipate claim 4. Adding the pentahydrate calcium MTHF disclosed in the '655 patent does not render the claim obvious. Both sides' experts agree that finding an unknown polymorph requires experimentation. While there may have been a motivation to discover new crystalline polymorphs of MTHF, doing so would have required a

14

process of trial and error.   There was therefore no reasonable expectation of success of finding Type I crystals.

## IV.   WRITTEN DESCRIPTION

### A.   Legal Standard

The written description "must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed.Cir.2010) (en banc).   The test is whether the disclosure "conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Id.*   This requires an "objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Id.*

### B.   Findings of Fact

1.   The level of ordinary skill in the art is either (1) a person with a bachelor's degree in chemistry, chemical engineering, or a related field and at least three years of experience in the pharmaceutical industry doing crystallization or other tasks involving solid state form or (2) a person with an advanced degree in chemistry, chemical engineering, or a related field.

### C.   Conclusions of Law

Watson argues that claim 4 lacks written description because the specification does not disclose any information from which a person of skill could conclude that the inventors possessed an MTHF polymorph with one water of crystallization, *i.e.*, a monohydrate.   (D.I. 108 at pp. 29-30).   Claim 4 calls for MTHF with "at least one" water of crystallization.   ('168 patent, col. 10, l. 60).   Dr. Rogers testified that the specification does not show that the inventors possessed MTHF with one water of crystallization.   (Tr. 2370:3-9).

15

Merck responds that the patent states, "the Type I modification typically contains $\geqq 3$ equivalents of water." (D.I. 111 at p. 30 (quoting '168 patent, col. 2, ll. 15-16)). "Typically" is not limiting, meaning that sometimes Type I crystals have fewer than three waters of crystallization. (Tr. 2852:8-10, 2853:18-20).

I agree with Merck. A specification is not required to describe each and every embodiment of a claim. Disclosing that the Type I crystal typically has greater than three waters of crystallization does not indicate that it never has fewer.

## CONCLUSION

Watson did not prove by clear and convincing evidence that claim 4 of the '168 patent is invalid. Merck is directed to submit an agreed upon final judgment within two weeks.

16

US006441168B1

(12) **United States Patent**　　　　(10) **Patent No.:**　　**US 6,441,168 B1**
Müller et al.　　　　　　　　　　　　(45) **Date of Patent:**　　　**Aug. 27, 2002**

(54) **STABLE CRYSTALLINE SALTS OF 5-METHYLTETRAHYDROFOLIC ACID**

(75) Inventors: **Rudolf Müller; Rudolf Moser**, both of Schaffhausen; **Thomas Egger**, Effretikon, all of (CH)

(73) Assignee: **Eprova AG**, Schaffhausen (CH)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/551,405**

(22) Filed: **Apr. 17, 2000**

(30) **Foreign Application Priority Data**

Apr. 15, 1999　(CH) ................................................ 695/99

(51) **Int. Cl.**[7] ............................................ **C07D 475/04**
(52) **U.S. Cl.** ...................................................... **544/258**
(58) **Field of Search** ........................................ 544/258

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,006,655 | A | * 4/1991 | Muller et al. | ............... 544/258 |
| 5,194,611 | A | * 3/1993 | Marazza et al. | ............ 544/258 |
| 5,223,500 | A | * 6/1992 | Gennari | ..................... 514/249 |
| 5,300,505 | A | 4/1994 | Muller | ....................... 514/250 |
| 5,324,836 | A | 6/1994 | Muller | ....................... 544/258 |
| 5,332,815 | A | 7/1994 | Molera | ...................... 544/258 |
| 5,350,850 | A | * 9/1994 | Vecchi | ....................... 544/258 |
| 5,382,581 | A | 1/1995 | Marezze | ..................... 514/245 |
| 5,457,202 | A | * 10/1995 | Scheib | ....................... 544/258 |
| 5,817,659 | A | 10/1998 | Muller | ....................... 514/245 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2807393 | 9/1978 |
| EP | 0455013 | 11/1991 |
| EP | 0495204 | 7/1992 |
| EP | 0535710 | 4/1993 |
| EP | 0537492 | 4/1993 |
| EP | 0539987 | 5/1993 |
| EP | 0682026 | 11/1995 |
| EP | 0773221 | 5/1997 |

OTHER PUBLICATIONS

Fitzhugh Pteridines 4, 187 (1993).*
Pauling, Linus, "General Chemistry, 2nd Ed.", 1953, Freeman, San Francisco, p 22 & 41.*
Hawley, Gessner, "The Condensed Chemical Dictonary", 1977, Van Nostrand, New York, p. 240.*
Loewenthal, H.J.E. "A Guide for the Perplexed Organic Experimentalist, 2nd Ed"., John Wiley & sons, Chichester, 1992, p 145.*
Wiberg, K.B., "Laboratory Technique in Organic Chemistry", 1960, McGraw–Hill, New York, p 99.*
Derwent English abstract of EP 539 987.
Derwent English abstract of EP 682 026.

* cited by examiner

*Primary Examiner*—Richard L. Raymond
*Assistant Examiner*—Thomas C McKenzie
(74) *Attorney, Agent, or Firm*—Millen, White, Zelano & Branigan, P.C.

(57)　　　　　**ABSTRACT**

This invention relates to stable crystalline salts of 5-methyl-(6R,S)-, -(6S)- and -(6R)-tetrahydrofolic acid, to methods of producing these salts and to the use thereof use as a constituent for the production of drugs or as a food additive, and to preparations containing these salts.

**17 Claims, 5 Drawing Sheets**



Crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type I)



FIG. 1



Crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type II)

Total Counts

FIG. 2



FIG. 3

Crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type III)



FIG. 4

A0026



Amorphous calcium salt of 5-methyl-(6S)-tetrahydrofolic acid

**FIG. 5**

US 6,441,168 B1

**1**

# STABLE CRYSTALLINE SALTS OF 5-METHYLTETRAHYDROFOLIC ACID

## FIELD OF THE INVENTION

This invention relates to crystalline salts of N-[4-[[(2-amino-1,4,5,6,7,8hexahydro-4-oxo-5-methyl-(6S)-, -(6R)- and -(6R,S)-pteridinyl)methyl]amino]benzoyl-L-glutamic acid (hereinafter called salts of 5-methyltetrahydrofolic acid), to the use thereof, and to a method of producing them.

## BACKGROUND OF THE INVENTION

Tetrahydrofolates are predominantly used as 5-formyltetrahydrofolic acid and the salts thereof (leucovorin) or as 5-methyltetrahydrofolic acid and the salts thereof, for the treatment of megaloblastic folic acid anaemia, as an antidote for increasing the compatibility of folic acid antagonists, particularly of aminopterin and methotrexate in cancer therapy ("antifolate rescue"), for increasing the therapeutic effect of fluorinated pyrimidines and for the treatment of autoimmune diseases such as psoriasis and rheumatoid arthritis, for increasing the compatibility of certain antiparasitic formulations, for instance trimethoprim-sulfamethoxazole, and for reducing the toxicity of dideazatetrahydrofolates in chemotherapy. 5-methyltetrahydrofolic acid is used in particular as a drug and as a food additive, as a vitamin preparation, for the prevention of neural tube defects, for the treatment of depressive illnesses, and for influencing the homocysteine level.

5-methyltetrahydrofolic acid and salts thereof are extremely unstable, and in particular are highly susceptible to oxidation [see also A. L. Fitzhugh, Pteridines 4 (4), 187–191 (1993) in this respect] and are therefore difficult to produce at a level of purity which is acceptable for a pharmaceutical active ingredient or a food additive.

Various methods, such as excluding oxygen as completely as possible or the addition of antioxidants such as ascorbic acid or reduced L-glutathione, have been employed in order to overcome the instability of 5-methyltetrahydrofolic acid. However, it is scarcely possible completely to exclude oxygen during use, and even then this is only possible at very considerable cost, and the addition of antioxidants is likewise not always possible. Accordingly, it has not been possible hitherto to identify a commercially feasible method which is suitable for the production of salts of 5-methyltetrahydrofolic acid which are satisfactorily stable and which are of high purity.

## SUMMARY OF THE INVENTION

Surprisingly, it has now been found that salts of 5-methyltetrahydrofolic acid which exhibit high chemical purity and excellent stability can be obtained by crystallising the corresponding salt from a polar medium after subjecting the solution to thermal treatment at a temperature above 60° C. The highly crystalline salts of 5-methyl-tetrahydrofolic acid which are thus obtained are stable at room temperature, practically without-limitation They are suitable as a constituent or as a starting material for the production of drug forms or food additives.

Accordingly, the present invention relates to crystalline salts of 5-methyltetrahydrofolic acid. Alkaline earth salts, particularly the calcium salts, are preferably used as the salts of 5-methyltetrahydrofolic acid for crystallisation. These crystalline salts of 5-methyltetrahydrofolic acid exhibit a purity, which has never been achieved hitherto, of >98%,

**2**

together with a stability, with respect to the initial value thereof and which has never been achieved hitherto, of >98% after storage for 6 months in air at 25° C. and 60% relative atmospheric humidity. The crystalline calcium salts of 5-methyl-(6S)-tetrahydrofolic acid exist in four different crystalline modifications (Type I, Type II, Type III and Type IV) and exhibit sharp bands when subjected to X-ray powder diffraction measurements (see Table 1 to Table 4 in this respect). Selected 2 theta values for the different crystalline modifications are 6.5, 13.3, 16.8 and 20.1 (Type I); 5.3, 6.9, 18.7 and 21.1 (Type II); 6.8, 10.2, 15.4 and 22.5 (Type III); and 6.6, 15.9, 20.2 and 22.5 (Type IV). Crystalline calcium salts of 5-methyltetrahydrofolic acid have a content of water of crystallisation of at least 1 equivalent of water per 1 equivalent of 5-methyltetrahydrofolic acid. Thus the Type I modification typically contains $\geqq 3$ equivalents of water, the Type II modification typically contains $\leqq 2$ equivalents water and the Type III and Type IV modifications typically contain $\leqq 5$ equivalents of water.

Other Salts of 5-methyl-(6R)-tetrahydrofolic acid and salts of 5-methyl-(6R,S)-tetrahydrofolic acid can likewise be obtained in highly crystalline form.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1–4 are self-explanatory X-ray powder diffraction diagrams of the 4 crystalline modifications of the calcium salts of the invention, and FIG. 5 is a diagram of the amorphous salt.

The present invention further relates to a method of producing highly crystalline salts of 5-methyltetrahydrofolic acid, which is characterised in that the corresponding salt of 5-methyltetrahydrofolic acid is crystallised. In this method, crystallisation of salts of 5-methyltetrahydrofolic acid is effected from a polar medium after thermal treatment at a temperature above 60° C., particularly above 85° C.

Substances which are particularly suitable as the polar medium include water or a mixture of water and an organic solvent which is miscible with water, such as watersoluble alcohols, e.g. methanol, ethanol, n-propanol, iso-propanol or ethylene glycol, a low molecular weight aliphatic water-soluble carboxylic acid e.g. formic acid, acetic acid or lactic acid, or water-soluble amides e.g. formamide, dimethylformamide, dimethylacetamide, 1-methylpyrrolidone, 2-methylpyrrolidone or 2-piperidinone. There are no particular restrictions with regard to the type of solvent used and with regard to the mixture ratio, since crystalline salts of 5-methyltetrahydrofolic acid generally exhibit solubilities which are lower than those of the corresponding amorphous forms.

Crystallisation is preferably effected from solutions. It is also possible to effect crystallisation from a suspension, however.

Aside from calcium salts, still further salts of 5-methyl-(6R,S) or (6R) or (6S) hydrofolic acids include but are not limited to other alkaline earth salts, for example, magnesium can be obtained in highly crystalline forms.

The different crystalline modifications can be converted into one another by further thermal treatments at temperatures above 60° C. Thus Type I, which is produced by crystallisation from a polar medium after thermal treatment at a temperature above 60° C., can be converted into Type II by drying sufficiently, e.g. under vacuum at 70° C., can be converted into Type III by sufficient thermal treatment at a temperature above 90° C., and can be converted into Type IV by sufficient thermal treatment at a temperature above 95° C.

US 6,441,168 B1

3

Type II can be converted into Type 1 again by adding water to the crystals, e.g. by treatment with water in a humidity cabinet at 90° C.

Crystallisation of the salts of 5-methyltetrahydrofolic acid occurs spontaneously or is effected by seeding with the corresponding crystalline salt of 5-methyltetrahydrofolic acid.

A suitable, preferred starting material for crystallisation is pure, amorphous or crystalline 5-methyl-(6S)- or -(6R)-tetrahydrofolic acid. Racemic 5-methyl-(6R,S) tetrahydrofolic acid can also be used, however, as can enriched 5-methyl-(6S)-, -(6R)- or -(6R,S)-tetrahydrofolic acid.

By using amorphous or partly crystalline, optically pure 5-methyltetrahydrofolic acid or salts thereof as the starting material for crystallisation, essentially crystalline salts of 5-methyltetrahydrofolic acid of a purity which has never been achieved hitherto, together with a stability which has never been achieved hitherto, are obtained by the method described here.

The present invention also relates to the use of highly crystalline salts of 5-methyltetrahydrofolic acid as a constituent for the production of drugs or food additive substances or for the production of other tetrahydrofolic acid derivatives, since, on account of their excellent stability in solid form, crystalline salts of 5-methyltetrahydrofolic acid are of a very good quality which remains constant with time, practically without limits. The present invention also relates to preparations containing highly crystalline salts of 5-methyltetrahydrofolic acid. These preparations are produced by known methods. They are employed analogously to the use of known substances from the field of tetrahydrofolates, such as 5-formyltetrahydrofolic acid (leucovorin) for example.

Without further elaboration, it is believed that one skilled in the art can, using the preceding description, utilize the present invention to its fullest extent. The following preferred specific embodiments are, therefore, to be construed as merely illustrative, and not limitative of the remainder of the disclosure in any way whatsoever.

In the foregoing and in the following examples, all temperatures are set forth uncorrected in degrees Celsius and unless otherwise indicated, all parts and percentages are by weight.

## EXAMPLES WHICH ILLUSTRATE THE INVENTION

The content of 5-methyltetrahydrofolic acid salt which is quoted in the examples was s determined by HPLC in each case and is given as % area. The water content was determined by a Karl Fischer method.

### Example 1

#### Stabilities

In order to determine the stabilities of the crystalline salts of 5-methyltetrahydrofolic acid, the substances were stored, together with comparison specimens, in air at 25° C. and at 60% relative humidity. The content of 5-methyltetrahydrofolic acid salt remaining was measured at periodic intervals and is given by comparison with the initial value.

4

| | Time of storage in months | | | | | |
|---|---|---|---|---|---|---|
| | 0 | 3 | 6 | 12 | 18 | 88 |
| Crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid | 100% | 98.6% | 98.7% | 99.1% | 99.0% | 97.8% |
| Amorphous calcium salt of 5-methyl-(6S)-tetrahydrofolic acid | 100% | | | 84.2% | | |

The crystalline salts of 5-methyltetrahydrofolic acid were still very light in colour even after an extended period of storage. In contrast thereto, the amorphous samples exhibited considerable discoloration, which occurred very rapidly.

### Example 2

#### X-ray Powder Plots

X-ray powder plots (diffraction spectra) of these substances were recorded in order to characterise the structural properties (crystalline modifications) of the crystalline salts of 5-methyltetrahydrofolic acid.

The crystalline salts of 5-methyltetrahydrofolic acid exhibited spectra of good resolution, with sharp bands and low background effects. The spectra indicated highly crystalline constituents.

Examples of spectra are illustrated in FIG. 1 (Type I), FIG. 2 (Type II), FIG. 3 (Type III) and FIG. 4 (Type IV), and are presented in Table 1 (Type I), Table 2 (Type II), Table 3 (Type III) and Table 4 (Type IV). For comparison, a spectrum of an amorphous sample was also recorded under analogous conditions and is presented as FIG. 5 (amorphous).

Selected 2 theta values for the different crystalline modifications of the crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid are listed below:

| Type | Selected 2 theta values |
|---|---|
| Type I | 6.5, 13.3, 16.8 and 20.1 |
| Type II | 5.3, 6.9, 18.7 and 21.1 |
| Type III | 6.8, 10.2, 15.4 and 22.5 |
| Type IV | 6.6, 15.9, 20.2 and 22.5 |

### Example 3

#### Solubilities

The solubility of the crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid is given in the following Table:

| | Solubility at 20° C. in | |
|---|---|---|
| Type | 0.9% NaCl | water |
| Type I | 1.6% | 1.1% |
| Type II | 5.8% | 3.8% |
| Type III | 1.5% | 1.0% |

### Example 4

#### Amorphous Calcium Salt of 5-Methyl-(6S)-tetrahydrofolic Acid

7.5 g 5-methyl-(6S)-tetrahydrofolic acid were introduced into 75 ml water at room temperature whilst passing $N_2$ into

US 6,441,168 B1

**5**

the batch, and the batch was adjusted to pH 12 with aqueous 30% sodium hydroxide solution. The clear solution which was thus obtained was adjusted to pH 7.5 with 37% hydrochloric acid and was treated with a solution of 7.15 g calcium chloride $6H_2O$ in 11.7 ml water. The white suspension which was formed was stirred for 5 hours and was then filtered under suction at room temperature. The solid was washed with water and was dried under vacuum at 45° C.

5.8 g of a white, amorphous calcium salt of 5-methyl-(6S)-tetrahydrofolic acid were obtained, which had a content of 98.0% and a 6S fraction corresponding to 99.6%.

Even after treating this substance at 60° C. in a humidity cabinet, no crystalline fractions could be determined either under a polarising microscope or by X-ray diffraction measurements.

## Example 5

### Crystalline Calcium Salt of 5-Methyl-(6 R,S)-tetrahydrofolic Acid

70 g 5-methyl-(6R, S)-tetrahydrofolic acid were placed in a vessel in 780 ml water and the batch was adjusted to pH 7.5 with 45.2 g of 30% NaOH. The clear, slightly reddish solution was treated with a solution of 62.7 g calcium chloride $6H_2O$ in 140 ml water, and the solid was filtered off and washed with a little water. The crude product which was thus obtained was suspended in water and treated at 90° C. for 24 hours.

74.0 g of a white, crystalline calcium salt of 5-methyl-(6R,S)-tetrahydrofolic acid was obtained, with a content of 99.1%.

## Example 6

### Crystalline Calcium Salt of 5-Methyl-(6R)-tetrahydrofolic Acid

16.5 g 5-methyl-(6R)-tetrahydrofolic acid were placed in a vessel in 100 ml water at 92° C. with 50 g calcium chloride $6H_2O$. The clear, slightly yellowish suspension was stirred for 10 minutes at 91° C., and the solid was filtered off, washed with a little water and dried at 35° C. under vacuum.

15.4 g of a light beige crystalline calcium salt of 5-methyl-(6R)-tetrahydrofolic acid were obtained, with a content of 97.9% and a water content of 7.8%.

## Example 7

### Type I

130 kg water were placed in a vessel and 12.8 kg 5-methyl-(6S)-tetrahydrofolic acid were introduced. The pH was adjusted to 11.6 with about 9.1 kg of 30% NaOH, and was then adjusted to 7.6 with about 1.9 kg of 37% hydrochloric acid. A suspension containing 0.3 kg carbon and 0.3 kg Cellflock was added to the clear solution. The solid was filtered off and washed with 13 litres of water. The filtrate was treated with a solution containing 8.3 kg calcium chloride $2H_2O$, heated to 90° C. and stirred for 30 minutes. The product was filtered hot and was washed with 2×20 kg water. The moist crude product which was thus obtained was slurried in 115 litres of water, heated to 90° C., immediately filtered hot, washed with 2×20 kg water, and dried at 40° C. under vacuum.

11.6 kg of a white, crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type I) were obtained, which had a purity of 99.0% and a water content of 14.5%.

**6**

## Example 8

### Type I

1600 ml water were placed in a vessel and 194 g 5-methyl-(6S)-tetrahydrofolic acid were introduced. The pH was adjusted to 7.0 with about 80 ml of 30% NaOH. A suspension containing 20 g carbon and 20 g Cellflock in 190 ml water was added to the clear solution. The solid was filtered off and washed with water. The filtrate was treated with 950 ml of a 5.5 M calcium chloride solution, heated to 90° C. and stirred for 60 minutes. The product was filtered hot, washed with water, and dried at 45° C. under vacuum.

156.2 g of a white, crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type I) were obtained, with a purity of 99.7% and a 6S fraction of 99.9%.

## Example 9

### Type 1 and Conversion Into Type II

554 g water were placed in a vessel and 53.1 g 5-methyl-(6S)-tetrahydrofolic acid were introduced. The pH was adjusted to 7.5 with 30% NaOH. 1.3 g carbon, 1.3 g Cellflock and 19.5 g water were added to the clear solution. The suspension was filtered and the solid was washed with 55 ml water. The filtrate was treated with a solution of 52.0 g calcium chloride $6H_2O$ in 84.6 g water, and was heated to 90° C. and seeded with 100 mg of the crystalline calcium salt of 5-methyltetrahydrofolic acid. After crystallisation had occurred, the product was filtered hot at 90° C. and was washed with 2×103 g water. The moist crude product which was thus obtained was slurried in 480 ml water, heated to 90° C., immediately filtered hot, washed as above, and dried at 45° C. under vacuum.

47.5 g of a white, crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type I) were obtained, with a purity of 98.8% and a water content of 12.2%.

This Type I modification could be converted into the Type II modification with a water content of 5.0% by drying it at 70° C. under vacuum for 30 minutes.

## Example 10

### Type III

15.8 9 of the calcium salt of 5-methyl-(6S)-tetrahydrofolic acid were heated to 95° C. in 140 ml water whilst passing $N_2$ through the batch. After 30 minutes at 95° C. the white suspension was filtered hot under suction, and the solid was washed with water and dried at 35° C. under vacuum.

14.0 g of a white, crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type III) was obtained, with a content of 98.9% and a 6S fraction of 99.9%.

## Example 11

### Type IV

20.0 g of the calcium salt of 5-methyl-(6S)-tetrahydrofolic acid were heated to 100° C. in 180 ml water whilst passing $N_2$ through the batch. After 30 minutes at 100° C. the white suspension was filtered hot under suction, and the solid was washed with water and dried at 25° C. under vacuum.

16.9 g of a white, crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type IV) were obtained, with a content of 98.3% and a water content of 9.9%.

US 6,441,168 B1

7

By drying it at 65° C. under vacuum, the water content of this product could be reduced to 5.5% without a different crystalline modification being obtained in the course of this procedure.

Examples of Uses of the Crystalline Material

(a) As constituent for the production of drugs:

Beside the well known uses of 5-formyltetrahydrofolic acid previously described, reference is invited to U.S. Ser. No. 09/095,572 for pharmaceutical preparations including pharmaceutically acceptable excipients, as well as dosage ranges of 5-methyltetrahydrofolic acid.

(b) As food additive:

The range of possible applications as food additive is very wide (from single preparations to multivitamin preparations and grain to breakfast foods). Please refer to e.g. WO 97/27764, SAMSF/Bailey et al., for examples (e.g. examples 1, 2, 6, 8 and 9 all contain formulas with 5-methyltetrahydrofolic acid).

(c) For the production of other tetrahydrofolic acid derivatives:

Under "other tetrahydrofolic acid derivatives", other salts of 5-methyltetrahydrofolic acid and the free acid itself are especially included.

The preceding examples can be repeated with similar success by substituting the generically or specifically described reactants and/or operating conditions of this invention for those used in the preceding examples. Also, the preceding specific embodiments are to be construed as merely illustrative, and not limitative of the remainder of the disclosure in any way whatsoever.

The entire disclosure of all applications, patents and publications, cited above and below, and of corresponding Swiss application 695/99, are hereby incorporated by reference.

From the foregoing description, one skilled in the art can easily ascertain the essential characteristics of this invention, and without departing from the spirit and scope thereof, can make various changes and modifications of the invention to adapt it to various usages and conditions.

TABLE 1

Crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type I)

| Diffractometer | : Transmission |
| Monochromator | : Curved Ge (111) |
| Wavelength | : 1.540598 Cu |
| Detector | : Linear PSD |
| Scan Mode | : Debye-Scherrer/Moving PSD/Fixed omega |
| 2Theta scan | |
| ! Peak search parameters | : Expected halfwidth : .150 |
| ! | Significance level : 2.5 |
| ! | Peak height level : 10 |

Peaklist [Range 1 : 2Theta = 5.000 34.980 .020 Imax = 765]

| ! | D | 2Theta | I (rel) | I (abs) | FWHM | h | k | l |
|---|---|---|---|---|---|---|---|---|
| | 13.474630 | 6.5544 | 100.0 | 755 | .2200 | | | |
| | 8.979750 | 9.8420 | 18.5 | 140 | .1600 | | | |
| | 6.936035 | 12.7526 | 20.3 | 153 | .1600 | | | |
| | 6.662427 | 13.2786 | 38.3 | 289 | .0800 | | | |
| | 6.497896 | 13.6164 | 29.4 | 222 | .1200 | | | |
| | 6.323596 | 13.9935 | 18.8 | 142 | .0200 | | | |
| | 6.148863 | 14.3933 | 14.0 | 106 | .0400 | | | |
| | 5.966675 | 14.8352 | 15.5 | 117 | .1200 | | | |
| | 5.593548 | 15.8309 | 27.5 | 208 | .2200 | | | |
| | 5.368022 | 16.5006 | 19.7 | 149 | .1127 | | | |
| | 5.282104 | 16.7709 | 42.5 | 321 | .2000 | | | |
| | 4.977751 | 17.8044 | 23.6 | 178 | .1800 | | | |
| | 4.672452 | 18.9782 | 32.7 | 247 | .2800 | | | |
| | 4.411916 | 20.1102 | 34.8 | 263 | .0800 | | | |

8

TABLE 1-continued

Crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type I)

| Diffractometer | : Transmission |
| Monochromator | : Curved Ge (111) |
| Wavelength | : 1.540598 Cu |
| Detector | : Linear PSD |
| Scan Mode | : Debye-Scherrer/Moving PSD/Fixed omega |
| 2Theta scan | |
| ! Peak search parameters | : Expected halfwidth : .150 |
| ! | Significance level : 2.5 |
| ! | Peak height level : 10 |

Peaklist [Range 1 : 2Theta = 5.000 34.980 .020 Imax = 765]

| ! | D | 2Theta | I (rel) | I (abs) | FWHM | h | k | l |
|---|---|---|---|---|---|---|---|---|
| | 4.257688 | 20.8467 | 34.2 | 258 | .2600 | | | |
| | 3.761157 | 23.6360 | 13.3 | 100 | .0400 | | | |
| | 3.699455 | 24.0361 | 22.3 | 168 | .1400 | | | |
| | 3.558431 | 25.0037 | 14.8 | 112 | .1000 | | | |
| | 3.439070 | 25.8864 | 21.0 | 159 | .1400 | | | |
| | 3.272550 | 27.2283 | 22.1 | 167 | .2800 | | | |
| | 3.218939 | 27.6907 | 17.0 | 129 | .1400 | | | |
| | 3.140884 | 28.3931 | 17.2 | 130 | .0800 | | | |
| | 3.013536 | 29.6198 | 13.9 | 105 | .1000 | | | |
| | 2.873482 | 31.0991 | 15.1 | 114 | .0200 | | | |
| | 2.782802 | 32.1395 | 16.6 | 125 | .0200 | | | |
| | 2.754830 | 32.4748 | 20.2 | 152 | .0600 | | | |
| | 2.713309 | 32.9858 | 15.4 | 116 | .1127 | | | |

TABLE 2

Crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid (Type II)

| Diffractometer | : Transmission |
| Monochromator | : Curved Ge (111) |
| Wavelength | : 1.540598 Cu |
| Detector | : Linear PSD |
| Scan Mode | : Debye-Scherrer/Moving PSD/Fixed omega |
| 2Theta scan | |
| ! Peak search parameters | : Expected halfwidth : .150 |
| ! | Significance level : 2.5 |
| ! | Peak height level : 10 |

Peaklist [Range 1 : 2Theta = 5.000 34.980 .020 Imax = 526]

| ! | D | 2Theta | I (rel) | I (abs) | FWHM | h | k | l |
|---|---|---|---|---|---|---|---|---|
| | 12.720530 | 6.9434 | 100.0 | 517 | .2600 | | | |
| | 8.508053 | 10.3891 | 29.4 | 152 | .2400 | | | |
| | 6.631466 | 13.3409 | 19.6 | 101 | .1200 | | | |
| | 5.883504 | 15.0461 | 71.2 | 368 | .2200 | | | |
| | 5.580025 | 15.8696 | 27.8 | 144 | .0800 | | | |
| | 5.010988 | 17.6854 | 42.5 | 220 | .1400 | | | |
| | 4.730443 | 18.7434 | 53.6 | 277 | .1400 | | | |
| | 4.215807 | 21.0556 | 35.5 | 184 | .0400 | | | |
| | 3.943879 | 22.5263 | 38.8 | 201 | .3600 | | | |
| | 3.581969 | 24.8368 | 24.8 | 128 | .0200 | | | |
| | 3.493985 | 25.4726 | 29.6 | 153 | .0400 | | | |
| | 3.309171 | 26.9212 | 22.7 | 117 | .0200 | | | |

TABLE 3

Crystalline calcium salt of
5-methyl-(6S)-tetrahydrofolic acid (Type III)

| Diffractometer | : Transmission |
| Monochromator | : Curved Ge (111) |
| Wavelength | : 1.540598 Cu |
| Detector | : Linear PSD |
| Scan Mode | : Debye-Scherrer/Moving PSD/Fixed omega |
| 2Theta scan | |
| ! Peak search parameters | : Expected halfwidth : .150 |
| ! | Significance level : 2.5 |
| ! | Peak height level : 10 |

Peaklist [Range 1 : 2Theta = 5.000 34.980 .020 Imax = 817]

US 6,441,168 B1

| 9 | | | | | | | | 10 |

| ! | D | 2Theta | I (rel) | I (abs) | FWHM | h | k | l |
|---|---|---|---|---|---|---|---|---|
| | 12.933490 | 6.8289 | 100.0 | 786 | .1200 | | | |
| | 11.036740 | 8.0043 | 18.9 | 149 | .0400 | | | |
| | 9.945525 | 8.8842 | 18.4 | 145 | .1000 | | | |
| | 8.877709 | 9.9554 | 12.4 | 98 | .0796 | | | |
| | 8.640580 | 10.2293 | 49.6 | 390 | .1000 | | | |
| | 7.873330 | 11.2292 | 6.4 | 50 | .1000 | | | |
| | 7.144004 | 12.3799 | 7.6 | 59 | .0800 | | | |
| | 6.948557 | 12.7295 | 20.3 | 159 | .1000 | | | |
| | 6.659956 | 13.2835 | 10.1 | 80 | .0400 | | | |
| | 6.466239 | 13.6834 | 7.6 | 60 | .0200 | | | |
| | 6.305060 | 14.0349 | 37.6 | 296 | .1000 | | | |
| | 6.154434 | 14.3802 | 16.4 | 129 | .0400 | | | |
| | 6.057193 | 14.6123 | 15.3 | 121 | .0600 | | | |
| | 5.920458 | 14.9517 | 17.6 | 139 | .1000 | | | |
| | 5.738533 | 15.4285 | 48.9 | 385 | .1000 | | | |
| | 5.530167 | 16.0136 | 30.3 | 238 | .1000 | | | |
| | 5.322477 | 16.6428 | 18.1 | 143 | .0600 | | | |
| | 5.245302 | 16.8894 | 47.4 | 372 | .0800 | | | |
| | 5.154604 | 17.1888 | 20.9 | 164 | .0796 | | | |
| | 5.038273 | 17.5888 | 30.8 | 242 | .1000 | | | |
| | 4.980502 | 17.7945 | 10.7 | 84 | .0796 | | | |
| | 4.759336 | 18.6286 | 31.6 | 248 | .1200 | | | |
| | 4.702846 | 18.8544 | 24.3 | 191 | .0796 | | | |
| | 4.575841 | 19.3827 | 15.6 | 122 | .0800 | | | |
| | 4.478961 | 19.8061 | 25.9 | 204 | .1000 | | | |
| | 4.377158 | 20.2716 | 48.1 | 378 | .1000 | | | |
| | 4.309006 | 20.5957 | 11.9 | 93 | .0796 | | | |
| | 4.242777 | 20.9207 | 31.3 | 246 | .0800 | | | |
| | 4.051441 | 21.9207 | 10.3 | 81 | .0200 | | | |
| | 3.940356 | 22.5467 | 67.8 | 533 | .1200 | | | |
| | 3.782452 | 23.5010 | 12.4 | 98 | .0400 | | | |
| | 3.609291 | 24.6458 | 9.5 | 75 | .0200 | | | |
| | 3.523157 | 25.2582 | 27.0 | 212 | .2000 | | | |
| | 3.460874 | 25.7205 | 43.4 | 341 | .0800 | | | |
| | 3.408545 | 26.1223 | 12.4 | 98 | .0796 | | | |
| | 3.341048 | 26.6596 | 16.1 | 127 | .2000 | | | |
| | 3.273575 | 27.2196 | 28.4 | 223 | .1400 | | | |
| | 3.188038 | 27.9645 | 12.6 | 99 | .0200 | | | |
| | 3.160110 | 28.2168 | 12.5 | 98 | .0400 | | | |
| | 3.103472 | 28.7427 | 15.0 | 118 | .0800 | | | |
| | 3.052658 | 29.2317 | 13.9 | 109 | .0600 | | | |
| | 3.017419 | 29.5808 | 27.7 | 218 | .1400 | | | |
| | 2.970195 | 30.0621 | 10.6 | 83 | .1200 | | | |
| | 2.921067 | 30.5800 | 13.9 | 109 | .0200 | | | |
| | 2.899222 | 30.8161 | 9.6 | 76 | .0796 | | | |
| | 2.870572 | 31.1314 | 9.6 | 75 | .0400 | | | |
| | 2.830661 | 31.5817 | 11.0 | 86 | .0200 | | | |
| | 2.758126 | 32.4349 | 11.3 | 89 | .0400 | | | |
| | 2.733265 | 32.7382 | 13.2 | 104 | .0600 | | | |
| | 2.695836 | 33.2058 | 13.7 | 108 | .0800 | | | |
| | 2.660160 | 33.6643 | 11.7 | 92 | .1000 | | | |
| | 2.609572 | 34.3369 | 9.2 | 72 | .0200 | | | |

TABLE 4

Crystalline calcium salt of
5-methyl-(6S)-tetrahydrofolic acid (Type IV)

Diffractometer : Transmission
Monochromator : Curved Ge (111)
Wavelength : 1.540598 Cu
Detector : Linear PSD
Scan Mode : Debye-Scherrer/Moving PSD/Fixed omega
2Theta scan
! Peak search parameters : Expected halfwidth : .150
! Significance level : 2.5
! Peak height level : 10
Peaklist [Range 1 : 2Theta = 5.000 34.980 .020 Imax = 473]

| ! | D | 2Theta | I (rel) | I (abs) | FWHM | h | k | l |
|---|---|---|---|---|---|---|---|---|
| | 13.398610 | 6.5916 | 97.7 | 446 | .1600 | | | |
| | 12.930100 | 6.8307 | 100.0 | 457 | .0915 | | | |
| | 11.033220 | 8.0069 | 19.2 | 88 | .0800 | | | |
| | 9.952926 | 8.8776 | 16.7 | 76 | .1200 | | | |
| | 8.912272 | 9.9167 | 25.5 | 116 | .1600 | | | |

TABLE 4-continued

Crystalline calcium salt of
5-methyl-(6S)-tetrahydrofolic acid (Type IV)

Diffractometer : Transmission
Monochromator : Curved Ge (111)
Wavelength : 1.540598 Cu
Detector : Linear PSD
Scan Mode : Debye-Scherrer/Moving PSD/Fixed omega
2Theta scan
! Peak search parameters : Expected halfwidth : .150
! Significance level : 2.5
! Peak height level : 10
Peaklist [Range 1 : 2Theta = 5.000 34.980 .020 Imax = 473]

| ! | D | 2Theta | I (rel) | I (abs) | FWHM | h | k | l |
|---|---|---|---|---|---|---|---|---|
| | 8.626970 | 10.2455 | 48.9 | 223 | .0800 | | | |
| | 6.931997 | 12.7600 | 37.4 | 171 | .1000 | | | |
| | 6.651761 | 13.3000 | 39.7 | 181 | .1200 | | | |
| | 6.499623 | 13.6127 | 32.8 | 150 | .0800 | | | |
| | 6.309299 | 14.0254 | 47.0 | 215 | .1600 | | | |
| | 6.161306 | 14.3641 | 25.1 | 115 | .1200 | | | |
| | 5.917463 | 14.9593 | 27.0 | 124 | .1000 | | | |
| | 5.736254 | 15.4347 | 49.8 | 227 | .0800 | | | |
| | 5.544314 | 15.9724 | 36.7 | 168 | .1600 | | | |
| | 5.255854 | 16.8553 | 62.1 | 284 | .2400 | | | |
| | 5.172075 | 17.1303 | 29.5 | 135 | .0915 | | | |
| | 5.035719 | 17.5978 | 37.0 | 169 | .1200 | | | |
| | 4.978813 | 17.8006 | 31.3 | 143 | .0400 | | | |
| | 4.758441 | 18.6321 | 40.7 | 186 | .1000 | | | |
| | 4.688853 | 18.9112 | 46.0 | 210 | .0915 | | | |
| | 4.577465 | 19.3757 | 29.5 | 135 | .0915 | | | |
| | 4.479376 | 19.8043 | 35.5 | 162 | .1000 | | | |
| | 4.383704 | 20.2410 | 63.6 | 290 | .1200 | | | |
| | 4.246196 | 20.9037 | 59.5 | 272 | .1400 | | | |
| | 4.088125 | 21.7216 | 19.7 | 90 | .0200 | | | |
| | 3.941748 | 22.5386 | 62.9 | 288 | .1400 | | | |
| | 3.778991 | 23.5229 | 27.9 | 128 | .0400 | | | |
| | 3.696576 | 24.0651 | 30.5 | 139 | .1000 | | | |
| | 3.523769 | 25.2537 | 35.6 | 163 | .2400 | | | |
| | 3.459683 | 25.7295 | 44.7 | 204 | .0800 | | | |
| | 3.338511 | 26.6803 | 28.7 | 131 | .0200 | | | |
| | 3.273450 | 27.2206 | 45.5 | 208 | .1000 | | | |
| | 3.135320 | 28.4446 | 23.6 | 108 | .0600 | | | |
| | 3.108154 | 28.6985 | 25.9 | 118 | .0200 | | | |
| | 3.018687 | 29.5681 | 34.4 | 157 | .1400 | | | |
| | 2.923031 | 30.5589 | 21.9 | 100 | .0200 | | | |
| | 2.844431 | 31.4249 | 18.4 | 84 | .0200 | | | |
| | 2.749393 | 32.5408 | 28.5 | 130 | .1200 | | | |
| | 2.713739 | 32.9804 | 25.6 | 117 | .0200 | | | |
| | 2.663207 | 33.6246 | 19.6 | 90 | .0600 | | | |
| | 2.613490 | 34.2838 | 17.4 | 80 | .0200 | | | |

What is claimed is:

1. A crystalline salt of 5-methyl-(6R,S)-, -(6S)- or -(6R)-tetrahydrofolic acid said crystalline salt having a water of crystallization of at least one equivalent per equivalent of 5-methyltetrahydrofolic acid.

2. A crystalline salt according to claim 1, of 5-methyl-(6S)- or -(6R)-tetrahydrofolic acid.

3. A crystalline calcium salt according to claim 1, of 5-methyl-(6S)- and -(6R)-tetrahydrofolic acid having ≧3 equivalents of water.

4. A crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.5, 13.3, 16.8 and 20.1 (Type I) said crystalline salt having a water of crystallization of at least one equivalent per equivalent of 5-methyltetrahydrofolic acid.

5. A crystalline calcium salt according to claim 1, of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 5.3, 6.9, 18.7 and 21.1 (Type II).

6. A crystalline calcium salt according to claim 1, of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.8, 10.2, 15.4 and 22.5 (Type III).

US 6,441,168 B1

11

**7**. A crystalline calcium salt according to claim **1**, of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.6, 15.9, 20.2 and 22.5(Type IV).

**8**. A method of producing crystalline salts of 5-methyl-(6R,S)-, -(6S)- and 5-methyl-(6R)-tetrahydrofolic acid, comprising subjecting a salt of 5-methyl-(6R,S)-, -(6S)- or -(6R)-tetrahydrofolic acid in a polar medium to a thermal treatment, at a temperature above 60° C., and thereafter crystallizing said salt from the resultant heated solution.

**9**. A method according to claim **8**, wherein the crystallisation is effected after thermal treatment at a temperature above 85° C.

**10**. A method according to claim **8**, wherein the crystallisation is effected from a solution.

**11**. A method according to claim **8**, wherein the crystallisation is effected from a suspension.

**12**. A method according to claim **10**, characterised in that crystallisation is effected from water or from a mixture of water and an organic solvent which is miscible with water.

**13**. A method according to claim **8**, wherein said salt is an alkaline earth salt.

12

**14**. A method according to claim **8**, wherein said salt is calcium.

**15**. A method of producing 5-methyl-(6S)-tetrahydrofolic acids with 2 theta values of 5.3, 6.9, 18.7 and 21.1 (Type II) comprising subjecting to sufficient thermal treatment a crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.5, 13.3, 16.8 and 20.1 (Type I).

**16**. A method of producing 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.8, 10.2, 15.4 and 22.5 (Type III) comprising subjecting to sufficient thermal treatment at above 90° C., a crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.5, 13.3, 16.8 and 20.1 (Type I).

**17**. A method of producing 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.6, 15.9, 20.2, 22.5 (Type IV) comprising subjecting to sufficient thermal treatment at above 95 ° C., a crystalline calcium salt of 5-methyl-(6S)-tetrahydrofolic acid with 2 theta values of 6.5, 13.3, 16.8 and 20.1 (Type I).

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,441,168 B1                            Page 1 of 1
DATED          : August 27, 2002
INVENTOR(S)  : Rudolf Muller et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 12,
Line 4, reads "acids," should read -- acid --

Signed and Sealed this

First Day of June, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

## PROOF OF SERVICE

I certify that on October 20, 2015, this BRIEF OF DEFENDANT-APPELLANT WATSON LABORATORIES, INC. was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record for Plaintiffs-Appellees, Merck & Cie, Bayer Pharma AG and Bayer Healthcare Pharmaceuticals Inc., as follows:

Adam Mortara
Rebeccas Horwitz
John Scott McBride
Faye Paul
BARTLIT BECK HERMAN
PALENCHAR & SCOTT LLP
54 West Hubbard Street
Suite 300
Chicago, IL 60654
Phone: (312) 494-4400
adam.mortara@bartlit-beck.com
rebecca.horwitz@bartlit-beck.com
scott.mcbride@bartlit-beck.com
faye.paul@bartlit-beck.com

Jack B. Blumenfeld
MORRIS, NICHOLS, ARSHT & TUNNEL LLP
1201 North Market Street
PO Box 1347
Wilmington, DE 19899
Phone:  (302) 658-9200
jbbefiling@mnat.com

*/s/ Steven A. Maddox*
Steven A. Maddox
MADDOX EDWARDS, PLLC
1900 K St. NW, Suite 725
Washington, DC  20006
(202) 830-0707
smaddox@meiplaw.com

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Counsel for Defendant-Appellant Watson Laboratories, Inc. certifies the following:

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

The brief contains 13,185 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point New Times Roman font.

Respectfully submitted,

**MADDOX EDWARDS, PLLC**

Dated:  October 20, 2015     By: _/s/ Steven A. Maddox_
STEVEN A. MADDOX
    *Counsel of Record*

*Attorney for Plaintiff-Appellant*
Watson Laboratories, Inc.